WILLIAM N. WILSON AND SHERRY WILSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; CALVIN F. MARTIN, JR. AND JANET MARTIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wilson v. Commissioner
Docket Nos. 40316-85; 13222-86.[1]
United States Tax Court
T.C. Memo 1989-266; 1989 Tax Ct. Memo LEXIS 267; 57 T.C.M. (CCH) 576; T.C.M. (RIA) 89266; June 6, 1989. Neil Dilman, for the petitioners. Roger Glienke and Elizabeth Cassidy, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: This case was assigned to Special Trial Judge Stanley J. Goldberg pursuant to section 7443A(b)(4) of the Internal Revenue Code of 1986 and Rule 180 et seq. [2] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. *269 OPINION OF THE SPECIAL TRIAL JUDGE GOLDBERG, Special Trial Judge: Respondent determined deficiencies in and additions to petitioners' Federal income taxes for the years and in the amounts as follows: PETITIONERS WILSON
Additions to Tax
Year
Deficiency
§ 6653(a)
§ 6653(a)(1)
§ 6653(a)(2)
§ 6659
1980
$  4,752
$ 237.60
--
--
$ 1,425.60
1981
995
--
$  49.75
* --
1983
8,353
--
417.65
* 2,505.90
PETITIONERS MARTIN
Additions to Tax
Year
Deficiency
§ 6653(a)
§ 6653(a)(1)
§ 6653(a)(2)
§ 6659
1980
$  2,513
$ 125.65
--
--
$   753.90
1983
11,167
--
$ 558.35
* 3,350.10
Respondent further determined that the Martins are liable for additions to tax under section 6621(c)(formerly section 6621(d)). [3] Respondent asserted in his Answer that *270 the Wilsons also are liable for additions to tax under section 6621(c). Respondent has filed motions in both cases seeking the award of damages pursuant to section 6673. The deficiencies are attributable to the disallowance of investment tax credits and investment tax credit carrybacks claimed on petitioners' respective joint income tax returns, together with the disallowance of lease payments deducted in connection with a medical equipment leasing activity. The issues for decision are: (1) whether petitioners are entitled to investment tax credits and investment tax credit carrybacks for Electrocaine XE-II medical equipment they leased; (2) whether petitioners are entitled to deductions for the payments they made to lease Electrocaine XE-II medical equipment; (3) whether petitioners are liable for the additions to tax under section 6653(a), section 6659, and section 6621(c); and (4) whether damages should be awarded to the United States under section 6673. FINDINGS OF FACT Some of the facts have been stipulated and are so *271 found. The Stipulation of Facts and attached exhibits are incorporated herein by reference. Background
These cases involve the leasing of medical equipment known as the Electrocaine XE-II. The Electrocaine XE-II (hereinafter "XE-II") is a transcutaneous electrical nerve stimulator, or TENS unit, an electrical device which is placed on various parts of the body to alleviate pain. The technology for TENS units has existed for years, but the Electrocaine prototype (XE-I) was developed in 1980 by Dr. Keith E. Kenyon. Dr. Kenyon agreed to allow Nelson L. Gross to market the original Electrocaine design, but eventually Mr. Gross, claiming to have further developed the unit, began marketing the successor unit known as the XE-II, as his own. The promotion became known as the "Electrocaine Medical Equipment Leasing Program" (the leasing program). In September 1983, Mr. Gross and the corporation he formed to market the XE-II, Neuro-Electro Dynamics, Inc. (NED), contacted John Paul Stroup. Mr. Stroup created an entity called Safe and Natural Succor, Inc. (SANS) for the purpose of buying XE-II units from NED and reselling them to leasing companies. NED granted SANS an exclusive *272 distributorship and purportedly sold 25,000 XE-II units to SANS at a price of $ 950 per unit. In November 1983, NED hired Bon Aqua, Inc. to manufacture the XE-II units. By December 31, 1983, Bon Aqua had manufactured between 200 and 400 units. Each of these units was assigned a serial number for identification. The projected cost of producing 25,000 units, including parts, labor and overhead was $ 60.98 per unit. Promotional Material
The promotional material for the leasing program was prepared by Mr. Stroup. All material contained in the brochures, however, was subject to approval by Mr. Gross. The brochures did not contain an appraisal of the fair market value of the XE-II, but did contain a valuation of the leasing program (the Tunnell Report). Mr. Gross provided Mr. Stroup with the figures for the claimed income projections and tax benefits of the program. On this point, the material claims that an individual in the 50 percent tax bracket, who leases 20 XE-II units for 82 months at $ 300 per unit, will have realized $ 23,880 in gross income by the end of the lease term. The lessee also will be the beneficiary of an investment tax credit of $ 12,000 ($ 6,000 X *273 10 percent X 20 units), and a tax savings of $ 3,000 on the first year advance rental payment. Tax savings also were projected for investors in 40 percent, 30 percent and 20 percent tax brackets. These brochures were distributed to each of the leasing companies involved in the promotion. Each leasing company adopted the brochures by printing it's name and address on the title page of the brochures under the words "Presented By." Medic Leasing, Inc.
By late 1983, four leasing companies were formed by various individuals for the purpose of buying XE-II units from SANS and then leasing the units to investor/lessees. One of the four leasing companies, Medic Leasing, Inc. (Medic), was formed by Harry Abercrombie. SANS purportedly sold 12,500 XE-II units to Medic at a price of $ 6,000 per unit. To finance Medic's purchase of the XE-II units from SANS, Harry Abercrombie on behalf of Medic, made a small cash down payment and executed three promissory notes in favor of SANS. The principal payable under these three promissory notes totaled $ 72,375,170, with interest payable at the rate of 9 percent per annum. Although the notes claim to be recourse as to principal and nonrecourse *274 as to interest, under the terms of the notes, no payment of principal or interest was due for 14 years, except from the equipment lease proceeds. Indeed, Medic never made any payments under the three promissory notes it had executed in favor of SANS. There was no negotiation of the per unit purchase price between SANS and Medic. Shortly thereafter, Harry Abercrombie and his son Rodger Abercrombie (the Abercrombies) began looking for investor/lessees for the XE-II units Medic had purchased. To find investors for the program, the Abercrombies solicited investment advisors, C.P.A.s, and financial planners. They also hired salesmen to promote the program. The leasing program operated such that investors were to lease a number of XE-II units from Medic and then sublease them to patients whose doctors had prescribed the units for their patients' pain. The units were to be subleased by patients for $ 120 per month. As part of the investment package, investors contracted with a management company which was to insure the XE-II units, and handle the actual leasing and maintenance of the units. Although the promotional material claimed that a number of management companies were available, *275 in these cases the management company was Electrocaine Medical Systems, Inc. (EMS), a corporation with which Nelson Gross was affiliated. Appraisals
Respondent's first expert witness, Donald R. McNeal, Ph.D., conducted a technical evaluation of the XE-II and compared it with two other TENS units that were available on the market. Dr. McNeal concluded that the XE-II had a three-year useful life and did not compare favorably with the other TENS units. More specifically, the XE-II was bulky, physically less attractive, had a single channel (as compared to dual channel), and had fewer performance options than the other commercially produced TENS units. The other TENS units used in the comparison had manufacturers' suggested retail prices of between $ 639 and $ 645. However, some retailers sold these units for as little as $ 450. With this in mind, Dr. McNeal concluded the fair market value of the XE-II during 1983 was less than $ 300. We find the actual fair market value of each XE-II unit was $ 295. Respondent's second expert witness, Herbert T. Spiro, examined the economics of the leasing program. Mr. Spiro concluded that the valuation of the leasing program contained *276 in the promotional materials (the Tunnell Report) assumes many variables which are unrealistic. To begin with, the Tunnell Report relies solely on information contained in the promotional brochure. It assumes a utilization rate which does not take into account equipment problems or lag time between rentals, and it fails to consider the XE-II's three-year useful life (as determined by Dr. McNeal), as well as commercial obsolescence due to technological advancements in the TENS unit market. Moreover, the Tunnell Report ignores an industry-wide standard for health or medical insurance reimbursement. Health or medical insurance companies typically discontinue payments for leased medical equipment once the rental payments equal the cost of purchasing the equipment. Mr. Spiro concluded that based on the above factors, this investment would be undesirable because investors could not realize a profit on this leasing venture. Petitioners' Transactions
The Wilsons
Petitioners William N. Wilson and Sherry Wilson (the Wilsons) resided in Huntington Beach, California when they filed their petition. During 1983, Mr. Wilson was employed as an automobile mechanic and Mrs. Wilson *277 was employed as a bookkeeper. Both of the Wilsons are high school graduates and each has obtained a few units of college credit. In October or November 1983, Mr. Wilson was introduced to the leasing program by his friend and former coworker, Rodger Abercrombie, one of the principals behind Medic. Mr. Wilson "skimmed" a promotional brochure at Medic's offices, but he did not receive any other written information about the leasing program prior to his investment. Rodger Abercrombie told Mr. Wilson that investors in the program could expect rental income from the units, as well as certain tax benefits. Mr. and Mrs. Wilson discussed the prospective investment. They had never seen a TENS unit, and they did not conduct any independent research into the XE-II, or other TENS units. They had no investment experience, and no experience in leasing medical equipment. Relying on Roger Abercrombie's representations, the Wilsons decided to invest in the leasing program. On December 20, 1983, the Wilsons signed an Electrocaine XE-II Equipment Lease with Medic. Under this agreement, the Wilsons agreed to lease 20 XE-II units from Medic for a period of 82 months. They also agreed to pay *278 Medic advance rent in the amount of $ 6,000 ($ 300 per unit X 20 units). They did not attempt to negotiate any terms of the lease, or the amount of money required by Medic as advance rent. The Wilsons signed two promissory notes in favor of Medic: one in the amount of $ 3,600 due on February 15, 1984; and, the other in the amount of $ 2,400 due on June 1, 1984. The Wilsons paid the notes in full on March 10, 1984 and July 3, 1984, respectively. At the time the Wilsons signed the lease agreement, they elected to delegate the management of their leased XE-II unit to EMS. They signed a management agreement with EMS, without negotiating any of the terms of the agreement. In addition, Medic, as lessor, elected to pass the investment tax credit allegedly available on the units to the Wilsons, as lessees. The Wilsons were assigned serial numbers with respect to each of the units they leased. The units represented by the serial numbers assigned to the Wilsons had not been manufactured by the end of 1983. On Schedule C attached to their 1983 joint Federal income tax return, the Wilsons deducted the $ 6,000 advance rent they paid to Medic for the lease of their XE-II units. They also *279 claimed an investment tax credit in 1983 and investment tax credit carrybacks to 1980 and 1981. The claimed investment credit and carrybacks were based on the price of $ 6,000 that Medic paid to SANS for each XE-II unit. The Wilsons had no income in 1983 from their leasing activities, and they did not know whether any of their XE-II units had ever been subleased. The Martins
Calvin F. Martin, Jr. and Janet Martin (the Martins) resided in El Segundo, California when they filed their petition. During 1983, Mr. Martin was employed as a manager in the engineering department at the Pacific Telephone & Telegraph Company and Mrs. Martin was employed as a secretary. Mr. Martin is a college graduate and Mrs. Martin has taken a few college courses. In November 1983, Mr. Martin was introduced to the leasing program by his tax return preparer, Jack Elliott. Mr. Elliott had received information pertaining to the leasing program from Robert J. Struth, a salesman hired by Harry Abercrombie. The Martins did not read any written information about the leasing program. Prior to his investment, Mr. Elliott told Mr. Martin that investors in the program could expect rental income from the *280 units, as well as certain tax benefits. Mr. and Mrs. Martin discussed the prospective investment. However, they never saw an XE-II unit and they never investigated the viability of the leasing program. The Martins had no previous experience in leasing medical equipment, but they had previous investment experience. In 1982, they had invested in a limited partnership which produced television pilots. Relying on Mr. Elliott's advice, the Martins decided to invest in the leasing program. On December 23, 1983, Mr. Martin signed an Electrocaine XE-II Equipment Lease with Medic. Under this agreement, Mr. Martin agreed to lease 20 XE-II units from Medic for a period of 82 months. He also agreed to pay to Medic advance rent in the amount of $ 6,000 ($ 300 per unit X 20 units). Mr. Martin made no attempt to negotiate any terms of the lease, or the amount of money required by Medic as advance rent. As payment for the advance rent, Mr. Martin obtained a $ 6,000 personal loan from Security Pacific National Bank. The bank subsequently issued two cashier's checks totaling $ 6,000 to Medic. Mr. Martin repaid the loan on April 27, 1984. At the time Mr. Martin signed the lease agreement, *281 he elected to delegate the management of his leased XE-II units to EMS. He signed a management agreement with EMS, without negotiating any of the terms of the agreement. In addition, Medic, as lessor, elected to pass the investment tax credit allegedly available on the units to Mr. Martin, as lessee. Mr. Martin was assigned serial numbers with respect to each of the units he leased. The units represented by the serial numbers assigned to Mr. Martin had not been manufactured by the end of 1983. On Schedule C attached to their 1983 joint Federal income tax return, the Martins deducted the $ 6,000 advance rent Mr. Martin paid to Medic for the lease of his XE-II units. They also claimed an investment tax credit in 1983 and an investment tax credit carryback to 1980. The claimed investment credit and carryback were based on the price of $ 6,000 that Medic paid to SANS for each XE-II unit. The Martins had no income in 1983 from their leasing activities, and Mr. Martin did not know whether any of his XE-II units had ever been subleased. OPINION The first issue is whether petitioners are entitled to investment tax credits and investment tax credit carrybacks, as well as deductions *282 for the lease payments they made with respect to their investments in the leasing program. Petitioners bear the burden of proving that they are entitled to the claimed credits and deductions. Rule 142(a). A common threshold for the claimed credits and deductions is the taxpayers must be engaged in an activity for profit. Sec. 183; Soriano v. Commissioner,90 T.C. 44 (1988). Whether an activity is engaged in for profit depends on whether the activity was undertaken with the objective of making a profit. Jasionowski v. Commissioner,66 T.C. 312, 319 (1976). Although petitioners need not have a reasonable expectation of making a profit, they must have entered into the activity with an actual and honest profit objective. Dreicer v. Commissioner,78 T.C. 642, 644-645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). In this context, "profit" means economic profit, independent of tax savings. Seaman v. Commissioner,84 T.C. 564, 588 (1985); Surloff v. Commissioner,81 T.C. 210, 233 (1983). In Rose v. Commissioner,88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989), *283 we adopted an objective test under which transactions involving "generic tax shelters" are disregarded if they are devoid of economic substance. In the case of a generic tax shelter, "the presence or absence of a profit objective is to be determined from the examination of certain objective factors which tend to indicate whether or not the disputed transaction had economic substance." Horn v. Commissioner,90 T.C. 908, 933 (1988); Rose v. Commissioner, supra at 414. Under the Rose criteria, a "generic tax shelter" possesses some or all of the following characteristics: (1) the materials promoting the program focus on the tax benefits; (2) the investors accepted the agreement without negotiation of price or terms; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly before the transaction in question; and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or in substance. Rose v. Commissioner, supra at 412. *284 We find petitioners' lease of the Electrocaine XE-II units possesses the characteristics of a generic tax shelter. The promotional material for the leasing program emphasizes the tax benefits of the lease. The brochure contains sample tax forms and features "considerable tax savings" as a highlight of investing in the program. Although it is unclear whether all petitioners received the promotional material, the information they received focused primarily on the tax aspects of investing in the leasing program. Petitioners accepted the terms of their respective leases and the amounts required as advance rent without negotiation. Moreover, the XE-II units were overvalued. The record established that some XE-II units were manufactured shortly before they were purportedly leased to petitioners. Each unit was manufactured at a cost of $ 60.98, and had a fair market value of $ 295. The units were nevertheless sold by NED to SANS for $ 950 each, and then sold by SANS to Medic for $ 6,000 each. Early in the trial, the testimony of the manufacturer of the XE-II units established that the units represented by petitioners' assigned serial numbers had not been manufactured by the end of *285 1983. The Martins obtained a bank loan and the Wilsons used notes to finance their respective leases with Medic. Medic, however, deferred the bulk of the consideration which it agreed to pay SANS for the XE-II units with the use of valueless promissory notes. Petitioners' activities with respect to the XE-II units fall within the definition of a generic tax shelter. Therefore, we apply the unified approach of Rose to determine whether the transaction is devoid of economic substance. The Rose approach evaluates the following factors: (1) the investment activities of petitioners, (2) the relationship between price and fair market value, (3) the structure of the financing, and (4) perceived Congressional intent. 1. Petitioners' Investment Activities
Prior to leasing the XE-II units, petitioners had no expertise or knowledge of the medical equipment leasing business. The individuals on whose advice petitioners relied when investing in the leasing program also had no expertise or knowledge of medical equipment or the leasing of TENS units. Petitioners did not independently investigate the economics of the leasing activity, nor did they contact someone knowledgable *286 to study the viability of the program. No effort was made to confirm the potential profitability of leasing TENS units. In fact, petitioners had not seen any XE-II units before leasing them. Petitioners entered into a management agreement with EMS to distribute the XE-II units to sublessors. There is no evidence to show any of the units leased by petitioners were subleased by EMS. No rental income was generated by the purported subleasing of the units, and petitioners could not state, even generally, how much income they expected to receive from their leasing activities. 2. Relationship Between Fair Market Value and Price
Bon Aqua was capable of manufacturing the XE-II at a cost of $ 60.98 per unit. Respondent's expert witness established that each fully assembled unit had a fair market value of less than $ 300. (We found the actual fair market value of each unit to be $ 295). SANS nevertheless purchased the units from NED for $ 950 per unit, and Medic purchased the units from SANS at a price of $ 6,000 per unit. The promotional materials for the leasing program did not contain an appraisal of the fair market value of the XE-II. The materials did contain, however, *287 a valuation of the leasing program. Despite the claims contained in the brochure, however, respondent's expert witness established that investors could not realize a profit on this leasing venture. The opinions of expert witnesses are admissible and relevant to the issue of value, but the opinions are weighed according to the experts' qualifications and other relevant evidence. See Johnson v. Commissioner,85 T.C. 469, 477 (1985). This Court may reject expert testimony if judged appropriate to do so. Helvering v. National Grocery Co.,304 U.S. 282 (1938); Chiu v. Commissioner,84 T.C. 722 (1985). Respondent's expert witnesses were thorough and professional. Their appraisals were performed with care and we accept the appraisals as reasonably accurate. The witness petitioners presented, however, had no appraisal experience and limited familiarity with TENS units. Overall, this witness did not assist in the Court's understanding of the fair market value of XE-II units, and therefore we give no weight to his testimony. 3. Structure of the Financing
A sale financed by deferred debt which in substance or in fact is *288 not likely to be paid, is an indicia of lack of economic substance. Rose v. Commissioner, supra at 419. Our analysis must focus on the substance rather than the form of the debt. Waddell v. Commissioner,86 T.C. 848, 902 (1986), affd. 841 F.2d 264 (9th Cir. 1988). In these cases, Medic executed three promissory notes totaling $ 72,375,170 to finance the purchase of 12,500 XE-II units from SANS. Although these notes were stated to be recourse as to principal and nonrecourse as to interest, no payment of principal or interest was due for 14 years, except from the equipment lease proceeds. The amount of these promissory notes was greatly inflated in relation to the value of the XE-II units. These notes were so commercially unreasonable, we do not believe they were ever intended to be repaid. Rather, these notes were used to inflate the value of the XE-II units to increase the amount of the investment tax credit. Although only nominal notes were created at the investor level, the investors did benefit from the inflated valuation when Medic elected to pass through the investment tax credit to petitioners. The promissory notes executed *289 by Medic to SANS, therefore, were an integral part of the arrangement between Medic and petitioners and indicate lack of economic substance in these cases. [4]
4. Perceived Congressional Intent
We do not believe Congress intended to encourage investment in medical equipment leasing ventures like the one at issue. See Rose v. Commissioner, supra at 421-422. From our analysis of petitioners' investment activities, the disparity between the claimed value of the XE-II and its actual fair market value, as well as the underlying financial structure of the leasing program, we find that petitioners' leasing activities were devoid of economic substance and should be disregarded for tax purposes. Therefore, petitioners are not entitled to deductions for the lease payments they made to Medic in 1983, nor are they entitled to their respective claimed investment tax credits and investment tax credit carrybacks. Section 6653(a) Addition to Tax
An addition to tax equal to five percent *290 is imposed if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. [5] Sec. 6653(a)(1). In addition, section 6653(a)(2) imposes an addition to tax in an amount equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations. Negligence is the lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner,85 T.C. 934, 947 (1985). Petitioners bear the burden of proof on this issue. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972). Petitioners entered into this leasing transaction without any experience in the medical equipment leasing industry and without seeking the advice of anyone who had experience with medical equipment. They had not examined any XE-II units prior to leasing them, and they did not seek the advice of anyone who could assess the program's viability. Petitioners did not even inquire into the existence of the XE-II units *291 before paying advance rent or claiming investment tax credits. These facts demonstrate petitioners' failure to exercise the care of a reasonable and prudent person in entering this investment and in claiming the credits and deductions. See Neely v. Commissioner, supra.Accordingly, petitioners are liable for the additions to tax under section 6653(a) for 1980, and sections 6653(a)(1) and (2) for the years following 1980. Section 6659 Addition to Tax
Respondent determined additions to tax under section 6659 for all petitioners for the taxable years 1980 and 1983. A graduated addition to tax is imposed on individuals whose underpayment of tax equals or exceeds $ 1,000 and is attributable to a valuation overstatement. Sec. 6659. A valuation overstatement exists if the value of any property claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation. Sec. 6659(c)(1). If the valuation claimed exceeds 250 percent of the correct valuation, then the addition to tax is equal to 30 percent of the underpayment, but only to the extent the underpayment is attributable to the valuation overstatement. Section 6659 *292 does not apply to underpayments of tax which are not "attributable to" valuation overstatements. See Todd v. Commissioner,89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988). At the conclusion of this trial, following seven days of testimony, petitioners offered to concede the XE-II units were neither in existence, nor placed in service during the years in which they claimed investment tax credits and lease payment deductions. Petitioners' concession was an attempt to avoid the section 6659 addition to tax by invoking Todd v. Commissioner, supra. If we accepted petitioners' concession, the claimed credits would be disallowed, not because the leasing activity lacked economic substance, but because the units were not placed in service during the years in issue. Todd v. Commissioner, supra. We decline to accept petitioners' concession. The Electrocaine Medical Equipment Leasing Program lacks economic substance. Where a leasing transaction lacks economic substance, all claimed credits and deductions associated with the transaction are disallowed entirely. The investment tax credits and lease payment deductions are not analyzed as separate *293 items for purposes of disallowance. In this context, petitioners' concession is meaningless. Although they offer to concede the equipment did not exist by the end of 1983, petitioners insist the transaction was economically viable, and maintain they are entitled to the lease payment deductions. Essentially, petitioners ask us to evaluate the credits and deductions separately, each on their own merit. This we refuse to do. In McCrary v. Commissioner, 92 T.C. (April 17, 1989), the taxpayers were involved in a purported "lease" of a master recording. Shortly before trial, the taxpayers conceded they were not entitled to the investment tax credit, in an effort to avoid the section 6659 addition to tax. The taxpayers did not contend the recording had the value they claimed on their tax returns, and they did not claim there was any objective possibility of profit from the transaction. Instead, the taxpayers argued they were entitled to deductions for rent and a distributor's fee because "subjectively [they] had an actual and honest objective of making a profit * * *." Following Todd v. Commissioner, supra, we accepted the taxpayers' concession and concluded the section *294 6659 addition to tax did not apply to any portion of the underpayment in that case. We made a determination of fair market value in McCrary, but only because of the additions to tax. The taxpayers did not require a trial that otherwise would have been unnecessary and the taxpayers did not force us to decide "difficult valuation issues where [the] case could be easily decided on other grounds." Todd v. Commissioner, 862 F.2d at 544. This case is distinguishable from McCrary v. Commissioner, supra. In the case at bar, petitioners' offer to concede came at the conclusion of a seven-day trial. Petitioners had ample opportunity to concede the investment tax credit issue either before the trial, or following the testimony of the XE-II manufacturer on the third day of trial. (The manufacturer's uncontroverted testimony established that the units assigned to petitioners were not manufactured in 1983.) Instead, petitioners steadfastly maintained throughout the trial that the equipment they purportedly leased was in existence by the end of 1983, that the equipment had the value they claimed on their tax returns, and that the transaction was economically viable. *295 Thus, we were required to determine fair market value as an integral part of our evaluation of whether the transaction lacked economic substance. Because valuation was inseparable from the grounds for disallowance (lack of economic substance), petitioners' last minute offer to concede is unacceptable and the section 6659 addition to tax is applicable. See Irom v. Commissioner,866 F.2d 545 (2d Cir. 1989). The Wilsons and the Martins based their respective investment tax credits on a claimed fair market value of $ 6,000 for each of the 20 XE-II units they leased. This value was equal to the price purportedly paid by Medic to SANS for each unit. The actual fair market value of the XE-II bears no relationship to the values petitioners used in claiming their investment tax credits. We have found the fair market value to be $295. Thus, the section 6659 valuation overstatement addition to the tax applies. The disallowed investment tax credits and carrybacks created an underpayment attributable to a valuation overstatement. However, the underpayments attributable to the rental payments are not subject to the overvaluation addition. Soriano v. Commissioner,90 T.C. 44, 62 (1988). *296 Petitioners deducted the rental expenses as payments for the use of property. In deducting the rental payments, they made no claim as to the value of the underlying property. Soriano v. Commissioner, supra.
Section 6621(c) Addition to Tax
Respondent determined the Martins were liable for additional interest under section 6621(c) for the taxable years 1980 and 1983. Respondent asserted in his Answer the Wilsons are also liable for additional interest for the years 1980, 1981, and 1983. Respondent bears the burden of proving the Wilsons are liable for this additional interest. Rule 142(a); Parker v. Commissioner ,86 T.C. 547, 566 (1986). Section 6621(c)(1) imposes an increased rate of interest when there is a "substantial underpayment attributable to * * * tax motivated transactions." For purposes of section 6621(c), an underpayment exceeding $ 1,000 is substantial. The additional interest accrues after December 31, 1984, even if the transaction was entered into prior to the enactment of section 6621(c). Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). *297 A tax motivated transaction includes any valuation overstatement within the meaning of section 6659(c). Sec. 6621(c)(3)(A)(i). Congress specifically amended section 6621(c)(3)(A) to add to the list of tax-motivated transactions: "(v) any sham or fraudulent transaction." [6] This Court has recently interpreted section 6621(c)(3)(A)(v) to include transactions which were without economic substance. Patin v. Commissioner,88 T.C. 1086, 1128-1129 (1987), affd. sub nom. without published opinion Hatheway v. Commissioner,856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner,864 F.2d 93 (9th Cir. 1989), affd. without published opinion Patin v. Commissioner,865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner,868 F.2d 865 (6th Cir. 1989). We have determined the Wilsons and the Martins made a valuation overstatement with respect to that portion of the underpayments attributable to the disallowance of the investment tax credits *298 and investment tax credit carrybacks claimed on their respective returns. We have also determined the transactions at issue were without economic substance and therefore a sham. Accordingly, for the Wilsons, respondent has met his burden of proof and interest will be imposed under section 6621(c) for 1980, 1981, and 1983. For the Martins, interest will be imposed under section 6621(c) for 1980 and 1983. Award of Damages Under Section 6673
Under section 6673, this Court may award damages to the United States not in excess of $ 5,000 whenever it appears the taxpayer has instituted or maintained proceedings primarily for delay, the taxpayer's position in such proceedings is frivolous or groundless, or the taxpayer unreasonably failed to pursue available administrative remedies. Although we are tempted, we exercise our discretion in declining to award damages in these cases. Therefore, we deny respondent's motions for damages. To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. These cases were consolidated for trial, briefing, ad opinion by Order of this Court dated October 5, 1987.↩
2. Hereinafter, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest due on the underpayment of tax attributable to negligence or intentional disregard of rules or regulations.↩
*. 50 percent of the interest due on the underpayment of tax attributable to negligence or intentional disregard of rules or regulations.↩
3. Section 6621(d) was amended and redesignated as section 6621(c) by the Tax Reform Act of 1986, sec. 1151(c)(1), Pub. L. 99-514, 100 Stat. 2744.↩
4. See Avers v. Commissioner,T.C. Memo. 1988-176; Apperson v. Commissioner,T.C. Memo. 1987-571↩, on appeal (7th Cir. Mar. 9, 1988).
5. For the taxable year 1980, this addition to tax is imposed under section 6653(a).↩
6. Pub. L. 99-514, sec. 1535(a), 100 Stat. 2085, 2750. This amendment is effective with respect to interest accruing after December 31, 1984.↩