Richard J. TODD and Denese W. Todd,
Petitioners–Appellees,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent–Appellant.

No. 88–4118.

United States Court of Appeals,
Fifth Circuit.

Dec. 16, 1988.

Nancy Morgan, Gary R. Allen, William S. Rose, Jr., Jonathan S. Cohen, Asst. Attys. Gen., Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellant.

Charles Baume, William Marc Weintraub, Los Angeles, Cal., for petitioners-appellees.

Before THORNBERRY, RUBIN and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Taxpayers Richard and Denese Todd appealed deficiencies and penalties assessed by the Commissioner of Internal Revenue. The Tax Court denied the taxpayers' claimed depreciation deductions and investment tax credits. In a later opinion, the Tax Court refused to impose the Commissioner's requested penalties under Internal Revenue Code § 6659 for tax underpayments attributable to valuation overstatements. The Commissioner appeals that determination. We affirm.

I

Beginning in 1980, FoodSource, Inc. sold investors interests in refrigerated food containers. The containers were designed to preserve perishable agricultural products during shipment to foreign and domestic markets. Each investor paid a fraction of the alleged purchase price of part or all of a refrigerated unit, signing a promissory note for the balance. FoodSource managed the containers, renting them to food transporters and regularly reporting profits supposedly earned by each investor.

Appellees Richard and Denese Todd purchased two FoodSource containers on December 8, 1981, and a third on October 14, 1982. The Todds paid $52,000 to Food-Source for each unit, signing notes to raise

the "purchase price" of each container to $260,000. Using the $260,000 figure as the basis of each unit, the Todds claimed investment tax credits and depreciation deductions for the 1981 and 1982 tax years, carrying unused portions of the investment tax credits back to 1979 and 1980. However, due to a payment dispute with Food-Source, the manufacturer retained control of all three containers purchased by the Todds until 1983.

The Internal Revenue Service assessed deficiencies and penalties against many investors in the FoodSource program, including the Todds. The Todds participated with various other "test case petitioners" in litigation before the Tax Court, challenging the IRS actions. In *Noonan v. Commissioner of Internal Revenue*,[1] the Tax Court determined that the Todds were not entitled to their claimed deductions and credits for 1979–82, since none of their containers had been placed in service until 1983. Other investors, such as the Hillendahls and the Hendricks, did have containers placed in service during the years for which they claimed tax benefits. Finding the obligations represented by the promissory notes illusory, the Tax Court limited the maximum adjusted basis taxpayers could claim in each FoodSource container to the lesser of its $60,000 fair market value or the actual cash payments made by the investor. Consequently, investors like the Hendricks and Hillendahls, though purchasing their containers with an actual profit motive, still received substantially smaller deductions and tax credits due to their reduced basis in their assets. These investors were also found liable under IRC § 6659 for a 30% addition to tax on portions of their tax deficiencies "attributable to [ ] valuation overstatement[s]."

Upon remand for calculation of deficiencies, the Commissioner assessed a § 6659 penalty against the Todds. The Todds appealed once again to the Tax Court. In *Todd v. Commissioner of Internal Revenue*,[2] the Tax Court refused to allow the § 6659 addition to tax. It reasoned that the Todds' deductions and credits were disallowed on the Commissioner's alternative ground that the food storage units had not been placed in service during the tax years in issue. Consequently, the Tax Court decided, the taxpayers' underpayments of tax could not be "attributable to" the valuation overstatements contained in their tax returns. The court refused to read § 6659 as imposing a penalty anytime a tax underpayment had been accompanied by a valuation overstatement. The Commissioner now asks us to reverse the Tax Court's decision.

## II

The statute we must construe, IRC § 6659(a), provides:

(a) Addition to the tax.—If—
(1) an individual, or
(2) a closely held corporation, or a personal service corporation,

has an underpayment of the tax imposed by chapter 1 for the taxable year which is attributable to a valuation overstatement, then there shall be added to the tax an amount equal to the applicable percentage of the underpayment so attributable.

The penalty only applies if the tax underpayment attributable to the overstated valuation equals at least $1000 and the claimed property value or adjusted basis is at least 150 percent of the actual value or basis.[3] The parties agree that, under the Tax Court ruling in *Noonan*, the Todds overstated the value of their FoodSource containers by 500%. If § 6659 applies, the Todds will be liable for an addition to tax of 30% of underpayments attributable to the valuation overstatements.[4]

The parties divide only over the meaning of the words "attributable to" in the statute. The Commissioner asks us to hold the Todds liable under § 6659, basing his arguments on the statute's language, its legislative history, its underlying policy, and the

1. T.C.Memo. 1986-449 (1986).

2. 89 T.C. 912 (1987).

3. IRC § 6659(c), (d).

4. IRC § 6659(a), (b).

Commissioner's perception of inequity in the Tax Court's result. First, the government argues that "attributable" ordinarily means "capable of being attributed." Thus, it contends that § 6659 applies anytime a taxpayer's underpayment is "capable of being attributed" to a valuation overstatement, regardless of the actual ground relied on to uphold the deficiency. Unfortunately, the Commissioner's formulation merely substitutes one ambiguity for another. Whether a given underpayment is "capable of being attributed" to a valuation overstatement depends on the meaning of "capable." In one sense, that urged by the government, there can be several problems with a particular deduction and the resulting tax deficiency is, then, capable of being attributed to any of them. In this case, however, the Commissioner asserted and the Tax Court found that the Todds' Food-Source units had not been placed in service until after the 1982 tax year. Given those circumstances, no deductions or credits could legally be taken with respect to these food containers on the Todds' 1981 and 1982 tax returns. Thus, the value claimed for the containers became irrelevant to the Todds' tax liability, since it played no part in calculating the tax they actually owed. One can certainly argue the position that a tax underpayment is not "capable of being attributed" to an irrelevant figure on the income tax return. While a client might be "capable" of kicking the bottom of her lethargic lawyer in an abstract sense, one might still say she was "incapable" of doing so at a time when the two were a thousand miles apart. Thus, we find the language of the statute ambiguous, and look instead to the legislative history.[5]

Congress initially enacted § 6659 as part of the Economic Recovery Tax Act of 1981. The House Ways and Means Committee recognized the large number of property valuation disputes clogging the tax collection system, and added the overvaluation penalty to discourage those taxpayers who would inflate the value of property on their tax returns in hopes of "dividing the difference" with the IRS.[6] Unfortunately, none of the formal legislative history provides a method for calculating whether a given tax underpayment is attributable to a valuation overstatement.

Such a formula is found, however, in the *General Explanation of the Economic Recovery Tax Act of 1981*, or "blue book," prepared by the staff of the Joint Committee on Taxation. Though not technically legislative history, the Supreme Court relied on a similar blue book in construing part of the Tax Reform Act of 1969, calling the document a "compelling contemporary indication" of the intended effect of the statute.[7] The committee staff explained § 6659's operation as follows:

> *The portion of a tax underpayment that is attributable to a valuation overstatement will be determined after taking into account any other proper adjustments to tax liability.* Thus, the underpayment resulting from a valuation overstatement will be determined by comparing the taxpayer's (1) actual tax liability (i.e., the tax liability that results from a proper valuation and which takes into account any other proper adjustments) with (2) actual tax liability as

5. The Commissioner also argues that if Congress wanted to reach the Tax Court's result, it should have used the phrase "solely attributed" to a valuation overstatement. He points out that in some code sections, Congress modified the "attributable to" language to narrow its meaning. *See, e.g.,* IRC § 6697(a) ("attributable solely to"). We find more helpful, however, code sections using the identical language we must construe. For instance, in § 6653, Congress clearly intended the phrase "attributable to" as synonymous with "due to." *Compare* IRC § 6653(b)(1) ("due to fraud") *with* IRC § 6653(a)(2), (b)(1)(A), (b)(2) ("attributable to fraud"). If we substituted this language into § 6659, the penalty would apply to "an underpayment of … tax … which is [due to] a valuation overstatement." This formulation seems more suggestive of the concrete causation approach applied by the Tax Court rather than the hypothetical causation theory advocated by the Commissioner.

6. H.R.Rep. No. 201, 97th Cong., 1st Sess. 243 (1981) *reprinted in* 1981–2 C.B. 352, 398.

7. *Federal Power Commission v. Memphis Light, Gas & Water Division,* 411 U.S. 458, 471–72, 93 S.Ct. 1723, 1731, 36 L.Ed.2d 426, 437 (1973).

reduced by taking into account the valuation overstatement. The difference between these two amounts will be the underpayment that is attributable to the valuation overstatement.[2]

[2] The determination of the portion of a tax underpayment that is attributable to a valuation overstatement may be illustrated by the following example. Assume that in 1982 an individual files a joint return showing taxable income of $40,000 and tax liability of $9,195. Assume, further, that a $30,000 deduction which was claimed by the taxpayer as the result of a valuation overstatement is adjusted down to $10,000, and that another deduction of $20,000 is disallowed totally for reasons apart from the valuation overstatement. These adjustments result in correct taxable income of $80,000 and correct tax liability of $27,505. Accordingly, the underpayment due to the valuation overstatement is the difference between the tax on $80,000 ($27,505) and the tax on $60,000 ($17,505) (i.e., actual tax liability reduced by taking into account the deductions disallowed because of the valuation overstatement), or $9,800 [sic].[8]

Applying this formula, the Tax Court determined that no portion of the Todds' tax underpayment was attributable to their valuation overstatements. The Todds' actual tax liability, after adjusting for the failure to place the food containers in service before 1983, did not differ from their actual tax liability adjusted for the valuation overstatements. In other words, where the deductions and credits for these refrigeration units were inappropriate altogether, the Todds' valuation of the property supposedly generating the tax benefits had no impact whatsoever on the amount of tax actually owed. Since the legislative history of § 6659 provides no alternative method of applying the statute, we are persuaded that the formula contained in the committee staff's explanation evidences congressional intent with respect to calculating underpayments subject to the penalty.

Our conclusion that Congress intended this formula to be applied in determining

liability for the § 6659 addition to tax is fortified by the legislative history of a closely related tax provision. In the Tax Reform Act of 1986, Congress added § 6659A providing, in statutory language and structure almost identical to § 6659, for an addition to tax where a tax underpayment "is attributable to an overstatement of pension liabilities."[9] This time, the House Ways and Means Committee report explained the provision:

The bill provides a new penalty in the form of a graduated addition to tax applicable to certain income tax overstatements of deductions for pension liabilities. As an addition to tax, this penalty is to be assessed, collected, and paid in the same manner as a tax. This addition to tax applies only to the extent of any income tax underpayment that is attributable to such an overstatement.

*The portion of a tax underpayment that is attributable to a valuation overstatement is to be determined after taking into account any other proper adjustments to tax liability.* Thus, the underpayment resulting from a valuation overstatement is the excess of the taxpayer's (1) actual tax liability (i.e., the tax liability that results from a proper valuation of deductions for pension liabilities and takes into account any other proper adjustments) over (2) actual tax liability as reduced by taking into account the valuation overstatement.[10]

Obviously, the second paragraph repeats, almost word for word, the test contained in the committee staff's explanation of § 6659. Given that Congress modelled § 6659A after § 6659, we conclude that the same formula should be applied under each statute—the formula contained in the legislative history of § 6659A and in the committee staff's explanation of § 6659.[11]

The Commissioner asserts, however, that the formula was only meant to apply "in

8. Staff of the Joint Committee on Taxation, General Explanation of the Economic Recovery Tax Act of 1981, at 333 (Comm.Print 1981).

9. *See* IRC § 6659A.

10. H.R.Rep. No. 426, 99th Cong., 1st Sess. 763 (1985); *see also* Staff of the Joint Committee on Taxation, General Explanation of the Tax Reform Act of 1986, at 770 (Comm.Print 1987).

11. The Tax Court also relied on a similar formula, achieving the same outcome, contained in the temporary Treasury Regulations for applying the § 6621(c) interest penalty on tax underpayments "attributable to tax motivated transactions." *See Todd,* 89 T.C. at 917–18; 26 C.F.R. § 301.6621–2T, at A–5. One of the tax motivated transactions subject to the interest penalty is

the simple case where there are separate, unrelated adjustments to an individual's tax, one of which is concededly attributable to a valuation overstatement."[12] He contends that this case is more complex because all of the adjustments to the Todds' tax liability "stem from their participation in the FoodSource shelter."[13] The Commissioner's attempted distinction finds no support in the language of the statute, its legislative history, or in the description of the committee staff's formula. The formula instructs us to determine § 6659 liability "*after*" taking account of "*any*" other proper adjustment to tax liability." It does not distinguish among other tax adjustments based on their degree of relationship to the valuation overstatement.

Finding no explicit support for his position, the Commissioner argues that the policies underlying § 6659 mandate imposition of the addition to tax in this instance. He notes that Congress wanted to make tax shelters based on property overvaluations less attractive. To allow the Todds to significantly overvalue the adjusted basis of these food containers on their tax returns without suffering an addition to tax would supposedly frustrate the policies behind § 6659. We point out, of course, that the Todds did not benefit from their tax shelter, since their depreciation deductions and investment tax credits were denied in full. Further, it is probable that Congress was balancing competing policies when it determined how to apply § 6659. First, Congress may not have wanted to burden the Tax Court with deciding difficult valuation issues where a case could be easily decided on other grounds.[14] Second, Congress may have wanted to moderate the application of the § 6659 penalty so that it would not be imposed on taxpayers whose overvaluation was irrelevant to the determination of their actual tax liability.[15] We cannot say for certain why Congress chose this test to measure § 6659 liability, rather than modifying the formula to address the Commis-

"any valuation overstatement (within the meaning of section 6659(c))." IRC § 6621(c)(3)(A)(i).

**12.** Appellant's Brief, at 16 n. 11.

**13.** *Id.*

**14.** Congress saw § 6659 as a measure to help the Tax Court control its docket:

> The conferees note that a number of the provisions of recent legislation have been designed, in whole or in part, to deal with the Tax Court backlog. Examples of these provisions are the increased damages assessable for instituting or maintaining Tax Court proceedings primarily for delay or that are frivolous or groundless (sec. 6673), the adjustment of interest rates (sec. 6621), the valuation overstatement and substantial understatement penalties (secs. 6659 and 6661)....
>
> The conferees believe that, with this amendment, the Congress has given the Tax Court sufficient tools to manage its docket, and that the responsibility for effectively managing that docket and reducing the backlog now lies with the Tax Court.... The Court should ... assert, without hesitancy in appropriate instances, the penalties that the Congress has provided.

H.R.Conf.Rep. No. 861, 98th Cong., 2d Sess. 985 (1984), U.S.Code Cong. & Admin.News 1984, p. 1673, *reprinted in* 1984–3 C.B. 1, 239. While Congress desired the penalties to be applied in "appropriate" cases, it may not have wanted the Tax Court to have to decide difficult valuation questions for no reason other than the application of penalties. Though judicial economy is not a factor in this case, where the Tax Court had already determined the correct value of the property in issue, the rule we adopt will determine whether the Commissioner can force the Tax Court to decide valuation issues in the future for the sole purpose of imposing a § 6659 addition to tax.

**15.** Congress knows how to adjust penalties to achieve deterrent effect. For instance, § 6653(a)(1) adds a five percent penalty to the entire tax underpayment if any portion of it "is due to negligence or disregard of rules or regulations." *Commissioner of Internal Revenue v. Asphalt Products Co.*, 482 U.S. 117, 107 S.Ct. 2275, 96 L.Ed.2d 97 (1987) (per curiam). By contrast, the seventy-five percent penalty on tax underpayments due to fraud applies only to the portion of the underpayment attributable to fraud. IRC § 6653(b)(1)(A).

Congress recognized that valuation questions involve difficult factual determinations. For this reason, it applied § 6659 only to significant overvaluations. *See* Staff of the Joint Committee on Taxation, General Explanation of the Economic Recovery Tax Act of 1981, at 332 (Comm.Print 1981). The same concerns may have led Congress to develop a test which would not penalize overvaluations having no effect on the taxpayer's tax liability. Further, Congress may have concluded that with significant penalties for fraud, negligence and tax motivated transactions, the Commissioner possessed sufficient weapons to deter tax shelter schemes without making § 6659 too draconian.

sioner's concerns. However, we remain convinced that the formula set out above represents Congress' intent for determining whether to impose the § 6659 addition to tax in any given case.

Finally, appellant argues that the Tax Court decision leads to anomalous results. He points out that some investors in the FoodSource program, like the Hillendahls and Hendricks, were found liable for the § 6659 penalty since their FoodSource units had been placed in service. Yet, arguably, the only difference between the Todds on the one hand and the Hendricks and Hillendahls on the other is that the deductions and credits claimed by the Todds suffer from greater infirmities. The Commissioner also raises the spectre that under the Tax Court ruling, taxpayers might avoid § 6659 penalties by denying they had a profit motivation in entering the transactions in issue.

We admittedly hesitate to ascribe an intent to Congress which might, at first blush, seem inequitable. However, though incongruous results can be considered in construing statutes, once a court knows Congressional intent, it may not vary the rules to avoid what it considers an undesirable outcome.[16] Having set forth the reasons for believing Congress intended to impose the committee staff's formula as the method for determining the application of § 6659, the results appellant complains of do not persuade us to reverse the Tax Court.

We note, however, that the results the Commissioner deplores may not be as inequitable as he argues. First, while the Hendricks and Hillendahls had to pay a § 6659 penalty, they were also allowed to retain a portion of their claimed depreciation deductions and investment tax credits. The Todds, on the other hand, while escaping the § 6659 penalty, were denied any of their claimed deductions and credits for the years in question. Further, to say that the Todds' claimed tax benefits were subject to greater infirmities than those claimed by

the Hillendahls and Hendricks does not mean that the Todds were more at fault. As the Tax Court noted, "the failure to place the containers in service during the years of purchase was due to circumstances beyond the control of the Todds and may not have been known to the Todds."[17]

Finally, the fear that taxpayers will deny profit motivation to avoid § 6659 penalties is unimpressive. Significant penalties attach to tax underpayments attributable to fraud, negligence, or tax motivated transactions. To the extent a taxpayer took the position that he entered a transaction without profit motive, but still claimed tax benefits relating to the transaction, he might well win a Pyrrhic victory, escaping § 6659 penalties only to subject himself to a much larger seventy-five percent penalty for fraud.

### III

We hold that the Tax Court applied the correct formula for determining when to impose penalties under § 6659. The Commissioner has failed to persuade us that an alternative test was intended by Congress. The Tax Court decision is AFFIRMED.

---

16. *See Asphalt Products Co.,* 107 S.Ct. at 2278 ("Judicial perception that a particular result would be unreasonable may enter into the construction of ambiguous provisions, but cannot

justify disregard of what Congress has plainly and intentionally provided.").

17. *Todd,* 89 T.C. at 921.