# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 26, 2012

Lyle W. Cayce
Clerk

No. 10-41132

BEMONT INVESTMENTS, L.L.C.,
by and through its Tax Matters Partner,

Plaintiff-Appellee - Cross-Appellant,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant - Cross-Appellee,

---

BPB INVESTMENTS, L.C.,
by and through its Tax Matters Partner,
DANIEL BEAL, BPB Investments, L.L.C.
Tax Matters Partner,

Plaintiffs-Appellees - Cross-Appellants,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant - Cross-Appellee.

---

Appeals from the United States District Court
for the Eastern District of Texas

---

Before REAVLEY, DAVIS, and PRADO, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

No. 10-41132

These consolidated cases sought judicial review of notices of final partnership administrative adjustment (FPAA) issued to Bemont Investments, L.L.C. (Bemont) and BPB Investments, L.C.(BPB). Following that review in the district court, the government appeals two aspects of the district court's judgment: (1) the ruling on the partnerships' motion for partial summary judgment disallowing the 40% valuation misstatement penalty, and (2) the ruling post trial holding that the FPAA issued to Bemont for the 2001 tax year was time-barred. The partnerships appeal the district court's judgment upholding the imposition of the 20% substantial understatement and negligence penalties. We affirm in part and reverse in part.

I.

On October 13, 2006, the Commissioner of the Internal Revenue issued FPAAs to Bemont and BPB for tax years 2001 and 2002. An FPAA is the partnership equivalent of a statutory notice of deficiency to an individual or non-partnership entity. The FPAAs disallowed losses from a foreign currency hedging transaction claimed on Bemont's 2001 partnership return and BPB's 2002 return. Both FPAAs also imposed four, alternative, non-cumulative penalties: (1) a 40% penalty for underpayment attributable to a gross valuation misstatement, (2) a 20% penalty for underpayment attributable to negligence, (3) a 20% penalty for underpayment attributable to a substantial understatement of income tax, and (4) a 20% penalty for underpayment attributable to a substantial valuation misstatement, all under 26 U.S.C. § 6662. The partnerships timely commenced actions for readjustment of partnership items by filing petitions in the district court. The actions were consolidated and referred by consent to a magistrate judge for all purposes.

Before trial, the court granted the partnerships' motion for partial summary judgment, holding that the government was foreclosed from imposing the valuation misstatement penalties (items (1) and (4) above). The remainder

of the case proceeded to trial. After a bench trial, the court determined that the FPAA issued to Bemont for 2001 was time-barred, precluding the tax assessment and penalties related to that tax year. The court upheld the disallowance of losses reported by the partnerships and the imposition of penalties against them (items (2) and (3) above) for 2002. Both sides appeal.

The transaction underlying this dispute is described by the IRS as a classic Son of BOSS tax shelter. This type of shelter creates tax benefits in the form of deductible losses or reduced gains by creating an artificially high basis in partnership interests. Ordinarily under the Internal Revenue Code, when a partner contributes property to a partnership, the partner's basis in his partnership interest increases. 26 U.S.C. § 722. When a partnership assumes a partner's liability, the partner's basis decreases. 26 U.S.C. §§ 722, 752. A Son of BOSS shelter recognizes the increased basis resulting from the partnership's acquisition of the partner's asset, but ignores the effect on that basis created by the partnership's assumption of the partner's liability. A higher basis can lead to the recognition of a loss or a reduced amount of gain when the asset is sold. The IRS classified such schemes as abusive tax shelters. Notice 2000-44, 2000-2 C.B. 255. The notice designated such shelters as "listed transactions" for purposes of Treasury Regulation §§ 1.6011-4T(b)(2) and 301.6111-2T(b)(2). A listed transaction is one the IRS has determined to be a tax avoidance transaction. Treas. Reg. § 1.6011-4T, as amended by T.D. 92000, 2002-2 C.B. 87.

Taxpayers who purchase and entities who promote listed transactions have certain disclosure requirements to the IRS. In general, the taxpayer must file a disclosure statement with any tax return that includes gains or losses from a listed transaction. 26 U.S.C. § 6011. Promoters of listed transactions, who are also called material advisors, must keep lists identifying persons who engage in such transactions and report that information to the IRS upon request. 26 U.S.C. § 6112.

No. 10-41132

To combat the problem of taxpayers and promoters who fail to comply with the disclosure requirements, Congress extended the usual three-year statute of limitations for issuance of a deficiency notice or FPAA in cases involving undisclosed listed transactions until one year after the taxpayer or his tax-shelter advisor has complied with the notice requirements. 26 U.S.C. § 6501(c)(10).

The particular shelter in this case took the following form. Andrew Beal formed BPB and contributed to BPB $5 million in cash and stock with a cost basis of $4 million in Solution 6, an Australian company. Beal's purported plan was to takeover Solution 6 in a transaction requiring substantial sums of Australian dollars. To hedge the risk that the Australian dollar would appreciate (relative to the U.S. dollar) prior to closing on a takeover bid for Solution 6, BPB entered into a digital currency swap transaction with Deutsche Bank. The swaps included two long positions that required BPB to pay Deutsche Bank a fee of $202.5 million. Two short positions required Deutsche Bank to pay BPB a fee of $197.5 million. BPB only paid Deutsche Bank the net difference between the long and short positions, i.e. $5 million. In addition, the swaps required BPB and Deutsche Bank to make offsetting fixed payments to each other - under which term Deutsche Bank paid BPB approximately $2.5 million. Thus, BPB's net cost of these transactions was $2.5 million.

Shortly after Beal formed BPB, BPB formed a partnership called Bemont with Montgomery. BPB contributed the swaps contracts and Solution 6 stock to Bemont. The partnerships reported that the tax basis of the swaps contributed was $202.5 million, ignoring the $197.5 million offset represented by the short swaps.

After the swaps terminated in November 2001, Montgomery left the Bemont partnership with BPB, causing Bemont to terminate for tax purposes. Once Montgomery exited, Bemont's only asset was the Australian currency,

No. 10-41132

which was deemed distributed to BPB.    In late 2001, Beal and Montgomery decided not to pursue the takeover of Solution 6 and BPB sold most of the Australian currency at its fair market value.  Using the inflated basis of $202.5 million, Bemont reported a $151 million foreign-currency loss on its 2001 return, which was allocated to Beal.  In 2002, after the deemed distribution from Bemont, BPB sold the remainder of the Australian currency and reported a $46 million foreign-currency loss on its 2002 return, which was allocated to Beal.

In adopting this tax treatment, Beal and Montgomery relied on the advice of tax accountant, Matt Coscia, that the tax treatment using the inflated tax bases was likely correct.  Neither Beal nor the partnerships filed the disclosure statements required by Notice 2000-44 and 26 U.S.C. § 6011 with their tax returns affected by participation in the transactions.

In April 2005, the IRS audited Beal's 2002 tax return and inquired about the $46 million loss allocated from BPB.  Beth Montgomery, the accountant who had prepared Beal's return, gave the IRS agent a copy of the agreement assigning BPB's rights under the swaps to Bemont.  The agreement listed all four swaps - two long and two short.  She also provided copies of the confirmation letters for the long swaps but did not provide further detail on the short swaps.  No adjustments were made by the IRS to Beal's return for that year.

On October 13, 2006, after the ordinary three-year statute of limitations for examining Beal's and the partnerships' 2001 returns had expired, the IRS issued FPAAs to BPB and Bemont.  The FPAA the IRS issued to Bemont covered the 2001 tax year, disallowing the losses from the swaps and determining that Bemont's partners had no basis in the partnership.  The FPAA the IRS issued to BPB dealt with the 2002 tax year, and disallowed the losses from the swaps and determined that the BPB partners had no basis.  Thus this case deals with the 2001 losses reported by Bemont and the 2002 losses reported by BPB.

No. 10-41132

II.

The district court's findings of fact are reviewed for clear error and legal conclusions are reviewed de novo. *Klamath Strategic Inc. Fund v. United States*, 568 F.3d 537, 543 (5th Cir. 2009).

III.

Ordinarily, the IRS must assess taxes within three years after a taxpayer files his return. 26 U.S.C. § 6501. Because the IRS issued the FPAA for Bemont's 2001 tax year more than three years after the return was filed, the district court had to determine whether the statute of limitations had run as to Bemont's 2001 return. The Internal Revenue Code allows an exception to the three year limitations period in 26 U.S.C. § 6501(c)(10) "with respect to a listed transaction as defined in 26 U.S.C. § 6707(c)(2)" when the taxpayer fails to make the required disclosure under 26 U.S.C. § 6011. The partnerships do not challenge the fact that the transactions in this case are listed transactions or that the required disclosures were not made in conjunction with the partnership returns. Rather, they rely on a separate provision of § 6501 which provides that as to listed transactions, the statute of limitations "shall not expire before the date which is 1 year after the earlier of (A) "the date on which the Secretary is furnished with the information so required," or (B) "the date that a material advisor meets the requirements of Section 6112 with respect to a request by the Secretary under that section 6112(b) relating to such transaction with respect to such taxpayer." 26 U.S.C. § 6501(c)(10).

The district court found that subpart (A) of § 6501(c)(10) did not apply because neither the partnerships nor Beal provided the required disclosure with their respective returns and because Montgomery did not furnish complete information about the swaps during the audit of Beal's 2002 tax return. Beth Montgomery provided full disclosure regarding the long swaps, but did not disclose the offsetting short swaps.

No. 10-41132

The district court therefore focused on subsection (B), which by its terms, commences the limitations period when a material advisor, in response to a request from the secretary, satisfies the disclosure requirement in § 6112. That provision requires material advisors to keep lists of persons engaging in listed transactions in a form and containing such information as the secretary may require by regulation.[1]

The regulation promulgated under the authority granted in § 6112 is structured in a series of questions and answers "relating to the requirement to maintain a list of investors in potential abusive tax shelters (temporary)." Treas. Reg. § 301.6112-1T (2002). Question 16 asks "In what manner must an organizer or a seller maintain a list?" Answer A-16 states:

> A list may be maintained on paper, card file, magnetic media, or in any other form, provided the method of maintaining the list enables the Internal Revenue Service to determine without undue delay or difficulty the information required by A-17 of this section.

Question 17 asks what information must be included on the list. The requirement provided in Answer A-17 is quoted in the margin.[2]

---

[1] 26 U.S.C. § 6112 reads as follows:

Material advisors of reportable transactions must keep lists of advisees, etc.
(a) In general. Each material advisor (as defined in section 6111) with respect to any reportable transaction (as defined in section 6707A(c)) shall (whether or not required to file a return under section 6111 with respect to such transaction) maintain (in such manner as the Secretary may by regulations prescribe) a list—
   (1) identifying each person with respect to whom such advisor acted as a material advisor with respect to such transaction, and
   (2) containing such other information as the Secretary may by regulations require.

26 U.S.C. § 6112.

[2] Answer A-17 states:
(a) A list must include the following information -
(1) The name of the tax shelter and the registration number, if any, obtained under section 6111;
(2) The TIN (as defined in section 7701(a)(41)), if any, of the tax shelter;

7

No. 10-41132

The district court found that pursuant to an IRS summons Deutsche Bank (a material advisor to the partnerships) provided information to the IRS no later than July 2005 which identified Bemont and BPB as participating in Son of Boss / Digital Options and that the information provided substantially complied with the statute and applicable regulations issued by the IRS as set forth in 26 C.F.R. § 301.6112-1T.  Specifically, the district court found that by July 2005, the IRS had information that identified BPB and Bemont, and as to these entities, the account number for the buy and sell, the foreign exchange amount, the foreign exchange rate, the amount of U.S. dollars involved, the trade and sell dates, and the percentage sold.   Accordingly, it held that the FPAA issued to Bemont in

---

(3) The name, address, and TIN (as defined in section 7701(a)(41)) of each person who is required to be included on the list under A-8 or A-10 of this section and, in the case of a tax shelter that is a transaction described in section 6111(d)(1)(A) and § 301.611-2T(b) whether or not the direct or indirect participant is a corporation, the name, address and TIN of each investor and any indirect corporate participant in the shelter if known to the organizer or seller;
(4) If applicable, the number of units (i.e., percentage of profits, number of shares, etc.)  acquired by each person who is required to be included on the list;
(5) The date on which each interest was acquired;
(6) The amount of money invested in the tax shelter by each person required to be included on the list under A-7 or A-10 of this section;
(7) A detailed description of the tax shelter that describes both the structure of the tax shelter and the intended tax benefits for participants in the tax shelter;
(8) A summary or schedule of the tax benefits that each person is intended or expected to derive from participation in the tax shelter, if known by the organizer or seller;
(9) Copies of any additional written materials, including tax analyses or opinions, relating to the tax shelter that have been given to any potential participants in the tax shelter or to any representatives, tax advisors or agents of such potential participants by the organizer or seller or by any other person who has participated in the offering of the tax shelter ( including any written materials that the organizer or seller has possessed);
(10) If the interest was not acquired from the person maintaining the list, the name of the person from whom the interest was acquired;
(11) the name and address of each agent of the person maintaining the list who is described in paragraph (b) of A-6 of this section.

Treas. Reg. § 301.6112-1T (2002).

No. 10-41132

October 2006 was too late and the IRS was time barred from assessing additional taxes or related penalties for the 2001 tax year.[3]

Although the parties present arguments addressing whether the information was provided to the IRS as a § 6112 list and whether the information includes sufficient details to satisfy the regulatory requirements of such a list, we conclude that we need not reach these issues because the disclosure did not satisfy the regulation's requirement in A-16 – that the information be provided in a form that enables the IRS to determine the information required by A-17 without undue delay or difficulty. Resolving the issue requires us to focus on the facts surrounding Deutsche Bank's disclosure.

In 2004, the IRS issued a series of summons to Deutsche Bank. The summonses were never disclosed in this litigation. However, Deutsche Bank's cover letters and responses to the IRS provide insight into what the IRS requested. A May 2005 letter states that the disclosure relates to "In re Matter of the Liability of Taurus Corporation and Deutsche Bank, AG for Penalties under I.R.C. Section 6707/6708, Summonses dated October 20, 2004."[4] The letter discloses that the bank had made previous productions of documents in January, March and April of 2005. Those submissions included 123 CDs that captured approximately 1,100,000 pages of documents. The May 2005 submission included an additional 103 CDs that captured approximately 1,090,000 pages of documents. The information on Bemont and BPB was included on 21 CDs labeled "Transaction: FX Digital Options" responsive to the

---

[3] With respect to the 2002 partnership return of BPB, there is no dispute that the FPAA issued to BPB on the same date was timely because it was issued within three years of the date the partnership filed its 2002 return.

[4] I.R.C. Section 6707 and 6708 deal respectively with "Failure to furnish information regarding reportable transactions" and "Failure to maintain lists of advisees with respect to reportable transactions."

No. 10-41132

IRS's summons headed "Son of Boss / Digital Options." The letter also indicates that Deutsche Bank expected to make an additional submission of documents.

The partnerships at issue in this case are identified on three of those pages in charts attached to internal Deutsche Bank emails. One email has the subject line "September Commissions" with a one page attachment that includes a list of clients and commissions due. The list includes BPB for a transaction labeled "SWAP." The second email has a subject line reading "Sell cad please" and has a 15 page chart attached. One page of the chart includes a reference to Beal and BM Investments LLC (the entity referred to as Bemont in this opinion), related account numbers, a reference to Australian dollars and an "FX Amount" of $4,849,660. Another page contains a reference to BM Investments with an account number.

Regardless of whether the information on the three discrete pages meets or does not meet the requirements of Question and Answer A-17 of the regulation, we find that the disclosure as a whole does not meet the regulations requirement in A-16 that the information be provided in a form that enables the IRS to determine the information required by A-17 without undue delay or difficulty. First, the references to BPB and Bemont were on three pages buried in over 2 million pages of documents. Second, the references were in charts attached to internal Deutsche Bank emails. Neither the emails or the chart titles give any hint that the attachments contained lists of advisees engaging in tax shelter transactions. Rather BPB and Bemont were listed in emails containing calculations of commissions due and in a list of sales orders. The taxpayer does not explain and it is not apparent to us how the IRS would be expected to locate these references within the volume of documents or how the IRS could easily determine from this information that any of the listed entities participated in abusive tax shelter transactions.

No. 10-41132

Accordingly, we conclude that the 2005 disclosures by Deutsche Bank did not trigger the one year limitations period in 26 U.S.C. § 6501(c)(10) and the district court's ruling to the contrary that the IRS's assessment against Bemont for the 2001 tax year was untimely is reversed.

IV.

Section 6662 of the Internal Revenue Code imposes a penalty of 20% of any underpayment of tax that is attributable to a number of causes, including negligence, substantial understatement of income tax, and substantial valuation misstatement under chapter 1 (income tax). This provision increases the valuation misstatement penalty to 40% in the case of a gross valuation misstatement. 26 U.S.C. § 6662(h)(1). The taxpayer is allowed a defense to the substantial understatement penalty "if there is or was substantial authority for such treatment." 26 U.S.C. § 6662(d)(2)(B). The code also allows the taxpayer a complete defense to both the negligence and understatement penalties in 26 U.S.C. § 6664(c)(1) if the taxpayer acted "in good faith" and with "reasonable cause." The district court found that the negligence penalty was properly imposed and that the good faith / reasonable cause defense did not apply. However, in a ruling on the partnerships' motion for partial summary judgment, the district court found that the 40% penalty for gross valuation misstatements did not apply. Because only one penalty can apply and because the district court had already confirmed the application of the negligence penalty, it did not consider the substantial understatement penalty or the taxpayer's defense of substantial authority for the treatment it took on the return.

The government appeals the disallowance of the 40% gross valuation misstatement penalty. The taxpayer cross appeals the negligence penalty and also argues that the substantial understatement penalty should not apply.

A.

11

No. 10-41132

The government argues that the district court erred in holding that the 40% penalty for basis valuation misstatements in 26 U.S.C. § 6662 does not apply when the IRS totally disallows the taxpayer's claimed loss or deduction. Section 6662's graduated penalty for valuation misstatements applies if a taxpayer's understatement is "attributable to" a "valuation misstatement". 26 U.S.C. § 6662(b). A "valuation misstatement" exists if the "value of any property (or the adjusted basis of any property) claimed on any return [on any income tax return] is 200 [or for gross misstatements 400] percent or more of the amount determined to be the correct amount of such valuation or adjusted basis." 26 U.S.C. § 6662(e)(1)(A), (h). The district court held that this penalty did not apply based on several Fifth Circuit cases dealing with the meaning of "attributable to" in similar contexts.

First, in *Todd v. Comm'r*, 862 F.2d 540 (5th Cir. 1988), this court construed 26 U.S.C. § 6659(a), which calls for an addition to the tax if the taxpayer had an underpayment of income tax "which is attributable to a valuation overstatement." The Tax Court had denied the taxpayer's depreciation deductions for the tax years in question because the asset with the arguably inflated valuation had not been placed in service during those years (which is a requirement for taking a depreciation deduction). *Id.* at 541. Applying a formula found in an explanation of the underlying statute in the *General Explanation of the Economic Recovery Tax Act of 1981* or "blue book" prepared by the staff of the Joint Committee on Taxation, the Tax Court compared (1) the actual tax liability after adjusting for the failure to place the assets in question into service in the applicable tax years and (2) the actual tax liability adjusted for the valuation overstatements. *Id.* at 542-43. Because there was no difference between the two amounts, the Tax Court determined that no part of the underpayment of tax was attributable to the valuation overstatement. *Id.* at 543.

12

> In other words, where the deductions and credits for these [assets] were inappropriate altogether, the Todds' valuation of the property supposedly generating the tax benefits had no impact whatsoever on the amount of tax actually owed.

*Id.* This court was persuaded that the Tax Court's approach was proper.

In *Heasley v. Comm'r*, 902 F.2d 380 (5th Cir. 1990), this court addressed again a valuation overstatement penalty in 26 U.S.C. § 6659(a). As in *Todd*, the IRS completely disallowed a deduction claimed for $10,000 in advance rental payments and a $20,000 investment tax credit that related to the taxpayer's investment in equipment for an energy conservation program. *Id.* at 382. The Heasleys had overvalued each of two units by $95,000. *Id.* However, applying the same rationale as in *Todd*, this court stated

> Whenever the I.R.S. totally disallows a deduction or credit, the I.R.S. may not penalize the taxpayer for a valuation overstatement included in that deduction or credit. . . . In this case, the Heasleys' actual tax liability does not differ one cent from their tax liability without the valuation overstatement included. In other words, the Heasleys' valuation overstatement does not change the amount of tax actually owed.

*Id.* at 383. Consistent with *Todd*, we found that the valuation overstatement penalty did not apply.

In this case, the IRS gave a number of reasons to disallow the losses reported by the partnerships. As described by the district court, the deductions were not disallowed because of a substantial valuation misstatement. Rather the IRS determined that the transactions which generated the purported losses were created for no business purpose other than tax avoidance, lacked economic substance and were an economic sham. Accordingly, the IRS disregarded the transactions in full. Because the IRS treated the transactions as a sham, and disallowed all tax attributes flowing from the transactions in full, any valuation

misstatement was irrelevant to the calculation of the tax and, under the precedent cited above, the 40% penalty cannot apply.[5]

The district court properly disallowed the 40% penalty for basis valuation misstatements.

### B.

In its cross-appeal, the partnerships argue that the district court erred in imposing the 20% negligence penalty and also argue that the 20% substantial understatement penalty should not apply.  As outlined above, 26 U.S.C. § 6662(b)(2) imposes a 20% penalty on "the portion of any underpayment which is attributable to . . . (1) Negligence or disregard of rules or regulations. [and] (2) Any substantial understatement of income tax."   The substantial understatement penalty does not apply "if there is or was substantial authority" for the treatment proposed by the taxpayer.  26 U.S.C. § 6662(d)(2)(B).  Both penalties are also excused if the taxpayer acted "in good faith" and with "reasonable cause."  26 U.S.C. § 6664(c)(1).  Resolution of this issue narrows to whether  either defense applies.

Section 6662 defines the conduct that justifies the imposition of the 20% negligence or disregard penalty as follows:  "'[n]egligence' includes any failure to make a reasonable attempt to comply with the provisions of this title, and the term 'disregard' includes any careless, reckless, or intentional disregard."  26 U.S.C. § 6662(c).  Negligence is strongly indicated if a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction or credit which

---

[5] The government attempts to avoid the application of the above cases by pointing to Treas. Reg., § 1.6662-5(g), which it argues mandates a finding that, when basis is reduced to zero, the deemed valuation misstatement is considered to be a gross valuation misstatement. However, we agree with the district court that the regulation does not purport to negate the holdings in the cases discussed above  – that the valuation misstatement penalty does not apply when the IRS completely disallows a deduction on other grounds.  It only helps determine whether a valuation misstatement is a gross misstatement.  In particular it specifies how to characterize a valuation misstatement when the true basis is determined to be zero.

would seem "too good to be true" to a reasonable and prudent person.  Treas. Reg. § 1.6662-3(b)(l); 26 C.F.R. § 1.6662-3(b)(1).  A taxpayer can avoid this penalty if he can show a "reasonable basis" for his position.[6] *Id.*  In addition, the reasonable cause and good faith defense may also provide relief from the negligence penalty, even if a return does not meet the reasonable basis standard.

The partnerships argue that the district court erred by ignoring their alleged defense of reasonable cause and good faith to the negligence penalty. The taxpayer bears the burden of proof on these defenses.  *Klamath Strategic Investment Fund v. United States*, 568 F.3d 537, 548 (5th Cir. 2009).

> The most important factor is the extent of the taxpayer's effort to assess his proper liability in light of all the circumstances. Treas. Reg. § 1.6664-4(b). Reliance on the advice of a professional tax adviser does not necessarily demonstrate reasonable cause and good faith; rather, the validity of this reliance turns on "the quality and objectivity of the professional advice which they obtained." *Swayze v. United States*, 785 F.2d 715, 719 (9th Cir. 1986).

*Id.*  In *Klamath*, the district court found that the taxpayers had

> sought legal advice from qualified accountants and tax attorneys concerning the legal implications of their investments and the

---

[6] Reasonable basis is defined in (b)(3) of the regulations as follows:

Reasonable basis is a relatively high standard of tax reporting, that is, significantly higher than not frivolous or not patently improper. The reasonable basis standard is not satisfied by a return position that is merely arguable or that is merely a colorable claim. If a return position is reasonably based on one or more of the authorities set forth in § 1.6662-4(d)(3)(iii) (taking into account the relevance and persuasiveness of the authorities, and subsequent developments), the return position will generally satisfy the reasonable basis standard even though it may not satisfy the substantial authority standard as defined in § 1.6662-4(d)(2). (See § 1.6662-4(d)(3)(ii) for rules with respect to relevance, persuasiveness, subsequent developments, and use of a well-reasoned construction of an applicable statutory provision for purposes of the substantial understatement penalty.) In addition, the reasonable cause and good faith exception in § 1.6664-4 may provide relief from the penalty for negligence or disregard of rules or regulations, even if a return position does not satisfy the reasonable basis standard.

26 CFR 1.6662-3.

resulting tax deductions. They hired attorneys to write a detailed tax opinion, providing the attorneys with access to all relevant transactional documents. This tax opinion concluded that the tax treatment at issue complied with reasonable interpretations of the tax laws. At trial, the Partnerships' tax expert concluded that the opinion complied with standards established by Treasury Circular 230, which addresses conduct of practitioners who provide tax opinions. Overall, the district court found that the Partnerships proved by a preponderance of the evidence that they relied in good faith on the advice of qualified accountants and tax lawyers.

*Id.* In contrast, in this case, the district court concluded that the taxpayers' professional advisor Coscia "was no more than a 'puppet'" for them and "rendered no real independent or objective advice. Coscia said what he was paid to say." Accordingly the district court found that "the reasonable cause defense and defense to negligence" were not available to the taxpayers. Based on our review of the record, these fact findings are not clearly erroneous and support the district court's conclusion that the 20% negligence penalty was properly assessed.

The IRS also imposed a 20% penalty for a substantial understatement of income tax. This penalty may be avoided if the taxpayer can show that he had "substantial authority" for the tax treatment of an item. 26 CFR 1.6662-4(d)(2). The standard for the substantial authority defense is more stringent than that for the reasonable basis defense that precludes imposition of the negligence or disregard penalty.[7] Relying on *Streber v. Comm'r*, 138 F.3d 216 (5th Cir. 1998),

---

[7] The regulations set forth the definition of "substantial authority" as follows: Substantial authority standard. The substantial authority standard is an objective standard involving an analysis of the law and application of the law to relevant facts. **The substantial authority standard** is less stringent than the more likely than not standard (the standard that is met when there is a greater than 50-percent likelihood of the position being upheld), but **more stringent than the reasonable basis standard as defined in § 1.6662–3(b)(3)**. The possibility that a return will not be audited or, if audited, that an item will not be raised on audit, is not relevant in determining whether

No. 10-41132

the partnerships argue that the substantial authority defense should apply and that because the standard for the substantial authority defense is more stringent than the reasonable basis standard, neither penalty is proper. Presumably because the district court found that the negligence penalty should be upheld, it did not address the substantial underpayment penalty because only one penalty may be imposed.

The taxpayer's reliance on *Streber* is misplaced. In *Streber*, two sisters in their twenties received over a million dollars each and hired an attorney to advise them on their potential tax liability. *Id.* at 217. The IRS charged them with negligence and substantial understatement penalties (under statutes that are very similar to the ones applicable to this case) for treating the funds as a gift. *Id.* at 218. As in this case, the taxpayers appealed only the penalties. *Id.* at 218-19.

Addressing the substantial authority defense, this court stated that substantial authority could rest on factual matters.

> In a recent decision, the Eleventh Circuit explained that where the substantial authority issue turns on evidence going both ways, "there is substantial authority from a factual standpoint for the taxpayer's position. *Only if there was a record upon which the Government could obtain a reversal under the clearly erroneous standard could it be argued that from an evidentiary standpoint, there was not substantial authority . . . .*" *Osteen v. Commissioner*, 62 F.3d 356, 359 (11th Cir. 1995). Apart from trying to confine Osteen to its facts, an untenable position, I.R.S. does not demonstrate how its principle is inapt here. The government makes no effort to assert that the only rational tax treatment of the transaction was as a gift made before 1985.

*Id.* at 223 (emphasis added). The taxpayers argue that their factual defenses (that the swaps had profit potential and the takeover bid for Solution 6 was not

the substantial authority standard (or the reasonable basis standard) is satisfied.
26 CFR 1.6662-4(d)(2) (emphasis added).

17

abandoned prior to the swaps) were supported by credible evidence. Thus the taxpayers in this case assert that the district court's fact findings against them do not preclude their reliance on the rejected factual assertions for purposes of the substantial authority defense. They argue that this is true even though the district court rejected their factual assertions.

We conclude that *Streber* is inapplicable to this case for several reasons. First, in *Streber*, the facts "were complex, largely undisputed, and not materially affected by the Tax Court's assessment of the sisters' lack of credibility." *Id.* The facts in this case were greatly disputed, particularly on the critical issue of whether the underlying transaction was a sham. Second, in *Streber*, neither the IRS or the Tax Court argued "that 'substantial authority' means only legal, not factual authority." *Id.* n.14. In this case, the government points to Treas. Reg. § 1.6662-4(d)(3)(iii), which clearly limits the relevant substantial authority to legal authorities.[8]

---

[8] The application part of the regulation reads as follows:

(iii) Types of authority. Except in cases described in paragraph (d)(3)(iv) of this section concerning written determinations, only the following are authority for purposes of determining whether there is substantial authority for the tax treatment of an item: Applicable provisions of the Internal Revenue Code and other statutory provisions; proposed, temporary and final regulations construing such statues; revenue rulings and revenue procedures; tax treaties and regulations thereunder, and Treasury Department and other official explanations of such treaties; court cases; congressional intent as reflected in committee reports, joint explanatory statements of managers included in conference committee reports, and floor statements made prior to enactment by one of a bill's managers; General Explanations of tax legislation prepared by the Joint Committee on Taxation (the Blue Book); private letter rulings and technical advice memoranda issued after October 31, 1976; actions on decisions and general counsel memoranda issued after March 12, 1981 (as well as general counsel memoranda published in pre-1955 volumes of the Cumulative Bulletin); Internal Revenue Service information or press releases; and notices, announcements and other administrative pronouncements published by the Service in the Internal Revenue Bulletin. Conclusions reached in treatises, legal periodicals, legal opinions or opinions rendered by tax professionals are not authority. The authorities underlying such expressions of opinion where applicable to the facts of a particular case, however, may give rise to substantial authority for the tax treatment of an item. Notwithstanding the preceding list

No. 10-41132

*Streber* is factually and legally distinguishable from the facts of this case and we decline to apply it.

## V.

For the above reasons, we reverse the judgment of the district court that the FPAA as to the 2001 tax year was untimely; we affirm the judgment of the district court in all other respects including disallowing the 40% valuation misstatement penalty and upholding the 20% negligence penalty for both 2001 and 2002. We remand this case to the district court for entry of judgment consistent with this opinion.

REVERSED in part; AFFIRMED in part; REMANDED.

---

of authorities, an authority does not continue to be an authority to the extent it is overruled or modified, implicitly or explicitly, by a body with the power to overrule or modify the earlier authority. In the case of court decisions, for example, a district court opinion on an issue is not an authority if overruled or reversed by the United States Court of Appeals for such district. However, a Tax Court opinion is not considered to be overruled or modified by a court of appeals to which a taxpayer does not have a right of appeal, unless the Tax Court adopts the holding of the court of appeals. Similarly, a private letter ruling is not authority if revoked or if inconsistent with a subsequent proposed regulation, revenue ruling or other administrative pronouncement published in the Internal Revenue Bulletin.

26 CFR 1.6662-4 (d)(3)(iii).

No. 10-41132

EDWARD C. PRADO, Circuit Judge, concurring:

Under this circuit's precedent, the 40% penalty for a tax underpayment attributable to a substantial valuation misstatement does not apply when the relevant deduction has been totally disregarded because the underlying transaction lacked economic substance. *See Todd v. Comm'r*, 862 F.2d 540, 542–45 (5th Cir. 1988); *Heasley v. Comm'r*, 902 F.2d 380, 383 (5th Cir. 1990); *see also* I.R.C. § 6662. Because we are precedent-bound to follow the *Todd/Heasley* rule, I concur in the majority opinion, including Part IV.A. I write separately, however, to note that the *Todd/Heasley* rule may be misguided.

I.

In *Todd*, we relied on the 1981 "Blue Book"—the name for a post-enactment summary of a major tax law prepared by the staff of the Joint Committee on Taxation—to interpret I.R.C. § 6659 (repealed 1989), the predecessor to § 6662, which penalized a tax underpayment "attributable to" a valuation overstatement. *See Todd*, 862 F.2d at 542–43 (interpreting Staff of the Joint Committee on Taxation, General Explanation of the Economic Recovery Tax Act of 1981, at 333 (Comm. Print 1981) ("Blue Book")). The Blue Book stated that "'[t]he portion of a tax underpayment that is attributable to a valuation overstatement will be determined after taking into account any other proper adjustments to tax liability,'" and offered a formula: the tax underpayment attributable to the valuation overstatement equals the difference between (i) "'actual tax liability (i.e., the tax liability that results from a proper valuation and which takes into account any other proper adjustments)'" and (ii) "'actual tax liability as reduced by taking into account the valuation overstatement.'" *Id.* at 542–43 (quoting Blue Book at 333). The Blue Book also offered an example: If an improper $20,000 deduction "was claimed by the taxpayer as a result of a valuation overstatement," and "another deduction of $20,000 is disallowed totally for reasons apart from the valuation

No. 10-41132

overstatement," then the overvaluation penalty should apply only to the former valuation-related deduction, not to the latter unrelated deduction. *Id.* at 543 (quoting Blue Book at 333 n.2). Thus, if the taxpayer's filing reflected a taxable income of $40,000, but the actual taxable income after adjusting for each improper deduction was $80,000, and the taxable income reduced by counting the valuation overstatement was $60,000, then the tax underpayment attributable to the valuation overstatement is $80,000($r)$ minus $60,000($r$), where $r$ is the tax rate. *See id.*

This example makes sense of the Blue Book's statement that the portion of tax underpayment attributable to a valuation overstatement will be determined "after taking into account any other proper adjustments to tax liability." According to the Blue Book, if a filing suffers from two unrelated sources of deficiency—e.g., one improper deduction stemming from a valuation overstatement of a particular asset, and another improper deduction stemming from a false charitable contribution—one should isolate the effect of the valuation-related deduction by (i) calculating the actual tax liability after correcting each improper deduction, (ii) calculating the tax liability reduced by counting the valuation-related deduction, and (iii) taking the difference. The Blue Book's formula and example are expressing a straightforward principle in mathematical terms: Do not apply the valuation overstatement penalty to a tax infraction, such as an improper charitable deduction, that is unrelated to (i.e., incapable of being attributed to) the valuation overstatement.

Yet, the *Todd* court misread the Blue Book's elementary guidance. In *Todd*, the defendant-investors overvalued their property and consequently claimed improper deductions and credits, which the Tax Court totally denied because the property had not been placed in service—a requirement for those deductions and credits. *Id.* at 540–41. We found support in the Blue Book to hold that the valuation overstatement penalty should not apply, because there

was no difference between the investors' actual tax liability (which excluded the overvaluation-generated tax benefit that was conditioned on placing the property in service) and their tax liability reduced by taking into account the overvaluation (which, we concluded, would still not have included the tax benefit, as the deduction was denied because the property had not been placed in service). *Id.* at 542–43. As noted, however, the Blue Book only explains that the overvaluation penalty should not apply to an improper tax benefit that is unrelated to the valuation overstatement. The Blue Book only covers the case of *two unrelated deductions*, one of which is caused by overvaluation. Accordingly, the Blue Book does not suggest that the overvaluation penalty should not apply if overvaluation is one of two possible grounds for denying *the same deduction* and the ground explicitly chosen is not overvaluation. No language in the Blue Book counsels against applying the penalty in such a case; the tax underpayment could still be "attributable to" the overvaluation. But we inferred otherwise, despite the Blue Book's silence, and begged the question.

What is more, we exacerbated *Todd*'s misinterpretation in *Heasley*, holding that "[w]henever the IRS totally disallows a deduction or credit, the I.R.S. may not penalize the taxpayer for a valuation overstatement included in that deduction or credit." *Heasley*, 902 F.3d at 383. Our misreading of the Blue Book thereby calcified in the form of the *Todd/Heasley* rule. Now, under our precedent, the overvaluation penalty is inapplicable even if the possible grounds for denying the same deduction—overvaluation and a lack of economic substance, for example—emerge from the same factual nucleus.

To be sure, a routine application of the *Todd/Heasley* rule decides this case. If an overvaluation generates an improper deduction, and the deduction is totally disallowed on the ground that the underlying transaction is a sham, we are bound to hold that the tax underpayment is not "attributable to" the valuation overstatement. In so reasoning, however, we have strayed from the

No. 10-41132

Blue Book's text.[1] Penalizing Defendants for the valuation misstatement would not flout the Blue Book's warning not to apply the valuation-misstatement penalty to a tax infraction that is unrelated to the overvaluation.[2]

## II.

Arguably, if the *Todd/Heasley* rule did not bind us, tax underpayment in this case would be "attributable to" a valuation overstatement. Defendants made a valuation misstatement when they asserted that the basis in the Australian currency was $202.5 million. In reality, the basis in the Australian currency was about $5 million. To create this anomaly, Defendants engaged in two sham, offsetting transactions; they moved the "long" and "short" swaps into the partnership; they recognized the $202.5 million increase in basis from the "long" swap assets, but ignored the $197.5 million decrease in basis from the "short" swap liabilities; and they dissolved the partnership, leaving behind a fake basis of about $202.5 million in the Australian currency. Defendants then sold the Australian currency, which was actually worth about $5 million, in the marketplace for its fair market value—presumably close to $5 million. They should not have reported much loss, if any. As we know, however, Defendants

---

[1] We have not only strayed from the Blue Book, but we have also strayed from *Todd*. In *Todd*, the possible grounds for denying the same deduction were independent: the overvaluation was unrelated to the failure to place the property in service. In our case, however, the possible grounds for denying the deduction overlap: the overvaluation and the transaction's lack of economic substance are factually interrelated.

[2] I am not suggesting that the Blue Book is high-quality legislative history. It is not available to members of Congress when they vote on the corresponding tax bill, and it is not approved by committee members. Still, although the Blue Book does not reflect congressional intent as reliably as a concurrent committee report does, according interpretive weight to the Blue Book could be appropriate, depending on the case. *See* Michael Livingston, *What's Blue and White and Not Quite as Good as a Committee Report: General Explanations and the Role of 'Subsequent' Tax Legislative History*, 11 Am. J. Tax Pol'y 91 (1994) (arguing that the Blue Book's interpretive weight should depend on the case and the role it is performing in the court's reasoning). Nonetheless, the problem here is that we found authority for the *Todd/Heasley* rule in the 1981 Blue Book, even though the Blue Book was, at best, silent on whether the overvaluation penalty should have applied in either *Todd* or *Heasley*.

made a valuation misstatement. They asserted that the Australian currency had a basis of $202.5 million. Thus, Defendants claimed a loss of about $200 million from the sale, because they had sold an item worth $202.5 million for much less. Consequently, when Defendants paid their taxes, they did not pay tax on about $200 million. But as we know, the loss was artificial. As a result of their valuation misstatement, Defendants paid less tax than they should have.

After analyzing the anatomy of Defendants' scheme, it becomes clear that the basis misstatement and the transaction's lack of economic substance are inextricably intertwined. The basis misstatement was the engine of, the vehicle behind the sham transaction. By misstating the basis in Australian currency, Defendants claimed an artificial loss when they sold the currency; by claiming the artificial loss, Defendants underpaid their tax. Misstating the basis thereby generated an improper tax benefit in direct proportion to the amount of the misstatement. Although that deduction was disregarded because the transaction lacked economic substance, attributing the tax underpayment only to the artificiality of the transaction and not to the basis overvaluation is making a false distinction. The basis misstatement is an essential element of the transaction's artificiality; in fact, disregarding the deduction for a lack of economic substance pulls the correct basis to zero, which eliminates the claimed loss, and renders the tax underpaid. Therefore, disregarding the transaction for a lack of economic substance does not alter the reality that the tax underpayment was ultimately "attributable to" the basis misstatement—or so one could argue, in a world without *Todd/Heasley*.

### III.

The near-unanimous opposition to the *Todd/Heasley* rule is worth highlighting. Except for the Ninth Circuit, every sister circuit that has considered the issue has concluded that the valuation misstatement penalty may apply even if the deduction is totally disallowed because the underlying

transaction lacked economic substance. *See Fidelity Int'l Currency Advisor A Fund, LLC v. United States*, 661 F.3d 667, 673–74 (1st Cir. 2011) (rejecting *Todd/Heasley* rule for "misreading" the Blue Book and following "without hesitation the dominant view of the circuits"); *Merino v. Comm'r*, 196 F.3d 147, 158 (3d Cir. 1999) (declining to apply *Todd/Heasley* and affirming valuation overstatement penalty because overvaluation was "an essential component of the tax avoidance scheme"); *Zfass v. Comm'r*, 118 F.3d 184, 191 (4th Cir. 1997) (rejecting *Todd/Heasley* and affirming valuation overstatement penalty because value overstatement was "primary reason" for disallowance due to lack of economic substance); *Illes v. Comm'r*, 982 F.2d 163, 167 (6th Cir. 1992) ("The tax benefit . . . was directly dependent upon the valuation overstatement, and the amount of the tax benefit was actually determined by the amount of the overvaluation.  The entire artifice of the [tax] shelter was constructed on the foundation of the overvaluation of its assets.  Plainly, then, [the tax] underpayment was attributable to [the] valuation overstatement."); *Gilman v. Comm'r*, 933 F.2d 143, 151 (2d Cir. 1991) ("The lack of economic substance was due in part to the overvaluation, and thus the underpayment was attributable to the valuation overstatement."); *Massengill v. Comm'r*, 876 F.2d 616, 619–20 (8th Cir. 1989) ("When an underpayment stems from disallowed depreciation deductions or investment credit due to lack of economic substance, the deficiency is attributable to overstatement of value, and subject to penalty [for valuation overstatement].").

In addition, the Federal Court of Claims and the Tax Court, when not bound by corresponding circuit precedent, have sided with the majority.  *See Clearmeadow Invs., LLC v. United States*, 87 Fed. Cl. 509, 535–36 (Fed. Cl. 2009) (siding with majority and criticizing *Todd/Heasley* rule); *Petaluma FX Partners, LLC v. Comm'r*, 131 T.C. 84, 104–05 (2008) (siding with majority and applying valuation misstatement penalty despite lack of economic substance,

No. 10-41132

where D.C. Circuit had not yet spoken on the issue), *rev'd on other grounds*, 591 F.3d 649 (D.C. Cir. 2010).

Although the Ninth Circuit has not joined the majority because it is bound by its own precedent to follow the *Todd/Heasley* rule, it has questioned the rule's wisdom. *Keller v. Comm'r*, 556 F.3d 1056, 1060–61 (9th Cir. 2009) (holding that the Ninth Circuit is "constrained by" *Gainer v. Comm'r*, 893 F.2d 225 (1990), which "rested in large part" on *Todd*, but recognizing the "sensible" approach of "many other circuits"). Only we remain completely out of step.

IV.

As a policy matter, the *Todd/Heasley* rule could incentivize improper tax behavior. If a taxpayer claims a benefit that is improper only due to a basis misstatement, then the valuation-misstatement penalty may apply. But by crafting a more extreme scheme and generating a deduction that is improper not only due to a basis misstatement, but also for some other reason (e.g., a lack of economic substance), the taxpayer increases his chance of avoiding the valuation-misstatement penalty—because, per the *Todd/Heasley* hierarchy whereby the overvaluation penalty is subordinated to any other proper adjustment, disallowing the deduction on the other ground could block the penalty. Amplifying the egregiousness of the scheme—to the point where the transaction is an utter sham—could thus, perversely, shield the taxpayer from liability for overvaluation. *See Fidelity,* 661 F.3d at 673 (recognizing this perverse policy result); *Gilman*, 933 F.2d at 150 (same); *see also Keller,* 556 F.3d at 1061 (same, though following circuit precedent not to apply penalty). A taxpayer could generate an enormous improper tax benefit by overstating an asset's basis, but then could escape the overvaluation penalty by strategically conceding a deficiency on the ground of economic substance. *See Clearmedaow*, 87 Fed. Cl. at 536 (recognizing the risk of such "gamesmanship"). By creating this perverse incentive structure, the *Todd/Heasley* rule frustrates the purpose

26

No. 10-41132

of the valuation-misstatement penalty, which is to deter taxpayers from inflating values and bases to generate large, improper tax benefits—such as a deduction to the tune of $200 million.

V.

Still, I understand that our hands are tied. Additionally, I am not convinced that Treasury Regulation § 1.662-5(g) frees us from the grip of *Todd/Heasley*. I therefore concur.

Judges Reavley and Davis concur in Judge Prado's special concurrence.

27