JACK C. CHOU AND DORIS H. CHOU, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Chou v. Commissioner
Docket No. 20645-87
United States Tax Court
T.C. Memo 1990-90; 1990 Tax Ct. Memo LEXIS 90; 58 T.C.M. (CCH) 1496; T.C.M. (RIA) 90090; February 26, 1990
Warren Nemiroff and Ronald D. Davis, for the petitioners. Debra Lynn Reale, for the respondent. WILLIAMS
MEMORANDUM FINDINGS OF FACT *91 AND OPINION WILLIAMS, Judge: The Commissioner determined a deficiency in petitioner's Federal income taxes in the amount of $ 38,447 for taxable year 1983. The Commissioner also determined additions to tax pursuant to sections 6653(a)(1), [1] 6653(a)(2), 6659 and increased interest pursuant to section 6621(c) for taxable year 1983. The issues for decision are: (1) the fair market value of a carved opal donated by petitioners to a museum, (2) whether petitioners are liable for an addition to tax for a valuation overstatement in respect of the donated opal, (3) whether petitioners are liable for increased interest due to a substantial underpayment attributable to a tax motivated transaction, and (4) whether petitioners are liable for an addition to tax for negligence. FINDINGS OF FACT Some of the facts are stipulated and are so found. Petitioners Jack C. and Doris H. Chou ("petitioners") resided in California when they filed the petition in this case. Petitioners timely filed a joint income tax return for taxable year 1983. In 1983, petitioners were *92 sole shareholders and employees of International Sensor Technology, a corporation that engineered solid state gas monitoring instrumentation. Jack Chou was an engineer, and Doris Chou was a chemist. Doris Chou was an enthusiastic amateur collector of gemstones including tarfires, spinels, sandstones and tourmalines. She generally bought cut stones directly from dealers or at gem shows. At some time prior to November 1982, she read an article about carved opals written by Ted Grussing ("Grussing") in Gems & Gemology magazine. Grussing, an attorney, owned two gemstone companies in 1983: Grussing and Associates, Inc., and BGN, Ltd.Grussing brought some of his opal collection to show petitioners in their home and on November 22, 1982, [2] petitioners purchased a rough opal [3] ("the opal"). Petitioners received an invoice from BGN, Ltd., evidencing the sale of a "110 gram piece of Exceptionally Fine rough Boulder Opal -- Gold Base with very intense play of color. Predominantly Blues/Greens/Yellows/Orange. An Exquisite Stone" for a price of $ 19,500 plus sales tax of $ 1,170. In conjunction with the sale of the opal, Grussing advised petitioners about the various tax consequences *93 of the purchase. Sometime later, petitioners returned the opal to Grussing who had selected an artist to carve it. [4] Doris Chou chose to have the stone carved in an oriental fashion but left the specific design up to the discretion of the artist. Petitioners received an invoice from Grussing for $ 1,801 for carving and setting the opal. *94 Grussing recommended two appraisers to petitioners. Jay Earl Anderson ("Anderson") of the Gemological Research Group, Inc., of Austin, Texas appraised the carved opal on January 7, 1983, at Grussing's request. Describing the opal as a single piece of carved Queensland boulder opal weighing 426 carats, Anderson gave an estimated market value of $ 306,185. Grussing also recommended David P. Wilber ("Wilber"), a longtime associate. Wilber had done appraisals for petitioners before. Wilber reported to petitioners on February 24, 1983, that the value of the carved opal was $ 700 per carat or $ 298,900. At some time prior to November 15, 1983, Grussing telephoned George E. Harlow ("Harlow"), the Curator of Minerals and Gems for the American Museum of Natural History in New York ("the museum"), to offer him petitioners' carved opal for the museum's collection. By letter dated November 15, 1983, Harlow expressed an interest in obtaining the carved opal for the museum. On December 6, 1983, Grussing sent the opal to the museum. On December 23, 1983, petitioners wrote to Harlow donating the opal to the museum. Petitioners insured the opal in shipment to the museum for $ 20,000. Petitioners *95 obtained updated valuation reports from Anderson and Wilber subsequent to their donation. Without reexamining the opal, Anderson determined that the market for carved opals had not changed and opined that the valuation in the retail market was $ 306,185 and that the fair market value was $ 292,875. In a report dated February 20, 1984, Wilber stated, without viewing the stone a second time, that the value of the carved opal was $ 750 per carat or $ 320,250. Respondent solicited the expert appraisal of Elly Rosen ("Rosen") who prepared a valuation report dated October 5, 1986. After having the carved opal in his possession for many months and examining it under various lights, Rosen determined that the fair market value of the carved opal was $ 65 per carat or $ 27,755. Rosen later prepared a supplement to his report on March 24, 1989, but did not change his conclusion. In 1986, in preparation for trial, petitioners again sought Grussing's advice on expert appraisers. Grussing advised petitioners to engage the services of Richard Drucker ("Drucker"), an experienced and well-respected gemologist. After visiting the museum and examining the carved opal, Drucker reported to petitioners *96 on March 6, 1989, that the value of the carved opal as of the date of donation was $ 30,000. Drucker was called to testify at trial by respondent. Subsequently, petitioners obtained the services of Ronald Pingenot ("Pingenot"), a gemstone appraiser, who determined on March 18, 1989, that the fair market value of the carved opal would have been $ 184,950 in 1983. On their 1983 income tax return, petitioners claimed a deduction for their donation of the carved opal to the museum. They claimed that the value of the donated opal was $ 292,875, of which petitioner deducted $ 221,991 and carried the remainder forward to 1984. By notice of deficiency dated March 26, 1987, respondent disallowed the 1983 charitable contribution deduction in excess of $ 27,755. On January 6, 1987, petitioners filed an amended joint Federal income tax return for 1983 by which they paid the deficiency to stop the accrual of interest but reserved the right to challenge the correctness of the deficiency and additions to tax. Petitioners submitted a check for $ 77,591 with the amended return requesting that $ 55,591 be allocated to the deficiency itself and $ 22,000 to interest. On April 10, 1989, petitioners *97 filed a First Amended Petition claiming an overpayment. OPINION The first issue we must decide is the fair market value of the carved opal as of December 23, 1983. Section 170 generally provides a deduction for contributions made to or for the use of an organization described in section 170(c) during the taxable year. The parties do not dispute that the museum is a qualified organization. For donations of property the amount of the deduction is the fair market value of the property at the time of donation. Sec. 170A-1(c)(1), Income Tax Regs.
Fair market value is defined as the "price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." Sec. 170A-1(c)(2), Income Tax Regs; United States v. Cartwright, 411 U.S. 546 (1973). Fair market value is a question of fact. Skripak v. Commissioner, 84 T.C. 285, 320 (1985); Zmuda v. Commissioner, 79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). Initially we must determine the appropriate market for purposes of valuation. *98 The determination of the proper market is also a question of fact. Anselmo v. Commissioner, 80 T.C 872, 881 (1983), affd. 757 F.2d 1208 (11th Cir. 1985). In valuing gemstones the market may be retail, wholesale, or a collectors' market.[5] Petitioners would not have had access to wholesale market prices because neither was a dealer in gemstones. Moreover, wholesale values are lower than the values of items traded in the collectors' market. Rosen determined that the appropriate market is the collectors' market because a knowledgeable buyer would not pay the higher retail prices. The record established that Doris Chou was a knowledgeable, albeit amateur, collector. We conclude that only values from the collectors' market are appropriate. The determined values reported by the expert witnesses range from $ 298,900 to $ 27,755. [6] We are not bound by the opinion of any expert witness when that opinion is contrary to our own sound *99 judgment. Barry v. United States, 501 F.2d 578, 583 (6th Cir. 1974); Chiu v. Commissioner, 84 T.C. 722, 734 (1985). We may accept or reject expert testimony as we find appropriate in our best judgment. Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938). Two of petitioners' expert witnesses, Wilber and Anderson, submitted reports without testifying. Although the parties agreed that they qualified as experts, we were given little information about their credentials or abilities. Furthermore, neither report sufficiently analyzes the reasons supporting the valuation. Their discussions are little more than terse descriptions of the carved opal. In comparison with the detailed explanation and reasoning provided by the other experts, we conclude that the reports prepared by Wilber and Anderson shed *100 little or no light on the problem. We give them no weight, and it appears that petitioners likewise have abandoned the opinions of these two experts. On brief, petitioners argue only for Pingenot's $ 184,950 and not for the higher figures determined by Wilber and Anderson. Because he could not find any carved opals of comparable size and quality, Pingenot devised a unique valuation methodology. He mentally divided the opal into a front facade and a back facade and evaluated the components of each. He found that the front facade of the opal was composed of five percent "common opal" [7] of "potch [8] and color," 15 percent "precious opal" [9] of good quality with "pinfire" [10] of blues and greens, [11] 30 percent "precious opal" of fine to very fine quality with patterns of blue, green, and orange and 50 percent "gem quality" with patterns of blue, green, violet, orange, and some red. The rear facade was composed of 20 percent "common opal" of "potch and color," 50 percent good quality of blue and green "pinfire" and 30 percent "precious opal" of fine quality with color play of blue, green and orange. Pingenot said that the opal was originally from Queensland, Australia but did not *101 describe it as boulder opal in his report. Pingenot then placed a value on the various parts of the opal based on cut and polished opals, known as "cabochons," of comparable quality that he held in his inventory. He did not take into account the quality of the carving. Additionally, Pingenot testified that because he examined the opal in the museum, he was limited to using natural daylight assisted by a penlight. After examining the opal, Pingenot concluded that it would fetch $ 184,950 on the collector's market. Pingenot's method of valuing the carved opal is not helpful to us. Pingenot analyzed the carved opal as a composite of cabochons and gave us the sum of their *102 values, the break-up value as it were. We are not interested, however, in the values of the various parts but rather in the value of the carved opal as a single piece. [12] Because it is not being sold as a cabochon, the varying quality of the actual opal substance is one factor in the overall value. Rosen testified that the presence of large amounts of common opal and potch would detract from the value of the higher quality opal present in the same piece. Additionally, when an opal is cut it may fracture or crumble, and it is probable that some of the value of the components could never be realized in fact. Pingenot did not approach this as a valuation of a single carved opal, and consequently his effort is useless to our determination. Respondent's expert, Rosen, is highly qualified. Rosen is a gemologist of the Gemological Institute of America ("GIA"), was Chairman of the Board of the International Society of Appraisers in 1986 and 1987, and President of the New York Chapter of the American Society *103 of Appraisers. Furthermore, he has frequently lectured on gem appraisal and has published numerous articles. We are inclined to give great weight to his opinions. Rosen kept the opal in his possession for many months, examining it under many different kinds of light. Rosen took the carved opal to gem shows and compared it to others he saw there. He considered both the quality and the design in determining that a collector would pay only $ 27,755 for the carved opal. Rosen explained that the value in carved opal comes partly from the ability of the artist to bring out the full play of color through his choice of design. The design on this opal, Rosen concluded, did little to display the beauty of the stone itself. Rather, he concluded that petitioners' opal was merely of "good commercial quality." Drucker is also a gemologist of GIA and is the publisher of the Guide, a pricing publication used by jewelers and appraisers around the world. He has lectured and published extensively in the field of gemological appraisal. Drucker concluded that the quality of the material made it appropriate for carving but not suitable for cutting into cabochons. Drucker estimated fair market *104 value by determining the cost of a rough opal of this size and quality and adding the cost of the carving. Applying a 30-percent mark up that was typical of the collector's market in 1983, Drucker calculated the fair market value to be $ 30,000. Both Drucker and Rosen determined that the carved opal was not made of "boulder opal." Boulder opal comes from certain mines in Australia and is found sandwiched between layers of rock. It is considered more valuable than other opal. If the boulder, or matrix, is removed from the opal it ceases to be boulder opal and is merely precious opal. Pingenot noted in his report that the boulder matrix had been cut away except for minuscule portions hardly visible. Petitioners argued that this carved opal is worth more because it is boulder opal, but we find that the weight of expert authority is against them. This opal may once have been boulder opal, but it ceased to be so by the time of donation, and its origins do not enhance its value. Additionally, we note that the opal was purchased only a year before it was donated for $ 19,500. Carving and setting the opal cost $ 1,801. Cost is important evidence of value where there are no intervening *105 factors to explain substantial appreciation. Chiu v. Commissioner, 84 T.C. 722, 736 (1985). Petitioners argue that the cost was low because the stone was purchased rough and uncut, and petitioners bore the risk that the stone would not be of good quality or would break or crack in carving. Nonetheless, on the basis of the expert testimony of Messrs. Drucker and Rosen, we cannot believe that this stone, worth $ 20,000, would increase 15 times in value at the hands of a carver who was so unfamiliar with opals that he removed all the boulder matrix. We conclude that Rosen's determination of fair market value is accurate. His opinion was well reasoned and his reputation unblemished. Drucker's valuation essentially confirmed Rosen's valuation figure. Thus, we conclude that the fair market value of the carved opal was $ 27,755 on December 23, 1983. Additions to Tax
Respondent determined that petitioners' underpayment of tax was attributable to a valuation overstatement. A valuation overstatement exists if the value of the property claimed on a return is 150 percent or more of the correct value. Sec. 6659(c). The underpayment attributable to the overvaluation *106 must be at least $ 1,000. Sec. 6659(d). On their 1983 income tax return, petitioners claimed a deduction of $ 221,991 of their total claimed charitable contributions of $ 294,875. The remainder was carried over to 1984. Petitioners argue that for purposes of section 6659 we must measure the difference between the correct value and the amount petitioners claimed as a deduction in taxable year 1983, or $ 221,991. Respondent maintains that the appropriate inquiry is into the difference between the correct value and the total value claimed of $ 292,875. Neither party cited any cases to support their positions, and we have found none. The statute distinguishes between the "valuation overstatement" and the "underpayment in tax." The valuation overstatement is the difference between the total value claimed and the correct value. Sec. 6659(c). In this case, then, the valuation overstatement would be the difference between the value petitioners claimed of $ 292,875 and the correct value of $ 27,755, viz, $ 266,120. The addition to tax, however, is measured not by the overstatement but by the amount of the underpayment in tax which is attributable to the valuation overstatement. *107 [13] Sec. 6659(a); Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988). The amount of the understatement for the year before us is the difference between what the petitioners actually deducted ($ 221,991) and what they should have deducted ($ 27,755), viz, $ 194,236. Section 6659(b) directs us to compute the applicable percentage to be applied to the underpayment using the claimed valuation. On their return, petitioners claimed that the value of the carved opal was $ 292,875, although they were only entitled to deduct $ 221,991, and we have determined that the actual value of the opal was $ 27,755. Thus, the claimed value is almost 1,055 percent of the correct value. Because this percentage is greater than 250 percent, the addition to tax will be 30 percent of the underpayment. Respondent also determined an increase in interest pursuant to section 6621(c), formerly section 6621(d). *108 Section 6621(c) provides for an increase in interest to 120 percent of the applicable rate for underpayments exceeding $ 1,000 attributable to tax-motivated transactions. The term "tax-motivated transactions" includes any section 6659(c) overvaluation. We sustain respondent's determination that petitioners are liable for the increased rate of interest for the underpayment attributable to the overvaluation statement. Respondent further determined the addition to tax for negligence pursuant to sections 6653(a)(1) and 6653(a)(2). For purposes of section 6653(a), negligence is defined as lack of due care or failure to do what a reasonable and prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners argue that they acted reasonably in relying on the expert appraisals of Anderson and Wilber who had been recommended to them by Grussing. Furthermore, they maintain that a reasonably prudent person would have attributed the increase in value from $ 19,500 for the rough uncut stone to $ 298,900 for the carved stone to the beauty of the carving. Both Rosen and Pingenot agreed that the value of a rough uncut stone *109 would increase when cut, carved, and polished. Rosen estimated that the value would increase by 15 percent. Pingenot suggested an increase of as much as 30 percent. Nonetheless, petitioners would have us believe that this opal increased in value from $ 19,500 by more than 15 times or 1,533 percent. An increase of this magnitude far exceeds the range of reasonably expected values. Furthermore, Doris Chou stated that in her experience she had rarely seen carved opal of this size and quality at gem shows. Rosen testified that petitioners' carving was of "commercial quality" and common at gem shows. Because Doris Chou was an experienced gemstone collector, we believe that she knew that the carved opal was not worth $ 298,900 or even $ 184,950. Additionally, we note that petitioners only insured the opal for $ 20,000 when it was shipped to the museum. Doris Chou stated that she was unable to obtain more insurance. We find that she purchased as much insurance as the value could support. Grussing discussed the tax consequences of the purchase with petitioners. Grussing then recommended two appraisers, one of whom petitioners did not know. We conclude that petitioners obtained *110 appraisals on this opal to support their tax deductions without seeking advice independent of Grussing. Doris Chou was an experienced collector and could have obtained an independent appraisal if she had so desired. Her failure to do so was negligent. We find that petitioners are liable for an addition to tax for negligence. Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue.↩
2. Although the parties stipulated that the sale occurred on November 22, the Chou's check for the opal was dated November 23. ↩
3. According to Elly Rosen, respondent's expert witness who examined the carved opal closely, the stone bore the signature of "S. Wang" and the number 1978. Rosen concluded that the opal had been carved in 1978 and thus was not a rough stone in 1982 when petitioners purchased it. None of the other experts mentioned the signature or date and the Court did not have occasion to see the opal. We cannot find that the opal was not rough and uncut in 1982.↩
4. Jack Chou estimated that the rough, uncut opal was in petitioners' possession for as much as 6 months before it was sent for carving. This is unlikely, however, because it was appraised as a carved stone in early January. The record indicates that petitioners had the uncut opal in their possession for only a very short time, if at all.↩
5. Rosen postulates the existence of a tax shelter market and argues its suitability for the valuation at hand. Nonetheless, Rosen did not give us sufficient information about this market to consider it seriously here.↩
6. Respondent argues in the alternative that petitioners' deduction should be limited to their out-of-pocket costs of $ 19,500. This figure, however, produces a greater deficiency than respondent initially determined in the statutory notice and, without moving to amend his answer, respondent cannot increase the deficiency.↩
7. Common opal was defined as opal without play of color. Play of color is the variety of colors that are seen in rapid succession when the opal is moved in the light. ↩
8. Potch is opal with color but without fine play of color. ↩
9. Precious opal is the lowest grade of opal that has play of color. ↩
10. Pinfire is a pattern of color consisting of small contiguous patches of color. It is the least valuable pattern of color. ↩
11. Blues and greens are more common and thus less valuable than reds and violets.↩
12. See Dubin v. Commissioner, T.C. Memo. 1986-433↩ (a single topaz could not be valued as if it were cut into smaller stones and sold in the retail market).
13. Any underpayment attributed to that portion of petitioners' charitable contribution that was carried over to 1984 could give rise to an addition to tax for a valuation overstatement in 1984. Taxable year 1984 is not before us, however.↩