T.C. Memo. 2015-130

UNITED STATES TAX COURT

BOSQUE CANYON RANCH, L.P., BC RANCH, INC., TAX MATTERS
PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

BC RANCH II, L.P. a.k.a. BOSQUE CANYON RANCH II, L.P., BC RANCH I,
INC., TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 1067-09, 25946-11.        Filed July 14, 2015.

Val J. Albright, Kyle R. Coleman, and Jim Scott (specially recognized), for

petitioners.

Anita A. Gill, Erin R. Hines, Alicia A. Mazurek, and Alexandra E.

Nicholaides, for respondent.

**[\*2]**      MEMORANDUM FINDINGS OF FACT AND OPINION

FOLEY, <u>Judge</u>:  The issues for decision, relating to 2005 and 2007, are whether Bosque Canyon Ranch, L.P. (BCR I), and BC Ranch II, L.P. (BCR II), were entitled to charitable contribution deductions relating to their donations of conservation easements, whether BCR I and BCR II (partnerships) were required to recognize income relating to sales of partnership property, and whether the partnerships are liable for section 6662(h) gross valuation misstatement penalties.[1]

FINDINGS OF FACT

I.  <u>BCR I</u>

BCR I was formed in July 2003 as a Texas limited partnership.  BC Ranch, Inc. (wholly owned by Alan Friedman), was BCR I's general and tax matters partner and held a 0.01% interest therein.  BC Ranch I, L.P. (owned by Mr. Friedman and BC Ranch, Inc.), and Addison Partners, L.P. (owned by Randolph Addison, Sr., and Randolph Addison, Jr.), were BCR I's limited partners, owning 83.33% and 16.66% interests, respectively.

_____

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

**[*3]**  On April 4, 2003, Trisept, Inc., wholly owned by Mr. Friedman, entered into an agreement with the Jack Jay Powell Estate to purchase a 3,729-acre tract in Bosque County, Texas.  On August 4, 2003, Trisept, Inc., assigned its interest in the agreement to BCR I and, on August 15, 2003, BCR I purchased, for approximately $4,940,000, the 3,729-acre tract.  On December 11, 2003, BCR I purchased, for approximately $34,516, an adjacent 15-acre tract.  Immediately following these purchases BCR I owned Bosque Canyon Ranch (BC Ranch), a 3,744-acre tract.

Between 2003 and 2005 BCR I made $2,200,658 of improvements to BC Ranch (e.g., renovation of a house; completion of a manmade lake; and the installation of fences, roads, and pools).  In 2004, at Mr. Friedman's direction, BCR I commenced marketing limited partnership interests (LP units) and furnished prospective purchasers offering documents prepared by the Addison Law Firm, P.C.  These documents included a confidential private placement memorandum (PPM); a subscription agreement; a memorandum prepared by a certified public accountant, Mark E. Mitchell, detailing tax issues; an unsigned draft document entitled "Bosque Canyon Ranch Declaration of Covenants, Conditions and Restrictions" (declaration of covenants); and an unsigned draft agreement of limited partnership (LP agreement).  The PPM provided that the

[*4] general partner had not requested or received a legal opinion relating to the tax consequences of an investment in BCR I. In addition, it provided that the Addison Law Firm, P.C., had "rendered certain services concerning this transaction" but had "not performed any tax related services or rendered any tax opinions".

In 2004 BCR I commenced marketing LP units at $350,000 per unit. Each purchaser would become a limited partner of BCR I, and the partnership would subsequently distribute to that limited partner a fee simple interest in an undeveloped five-acre parcel of property (Homesite parcel).[2] The distribution of Homesite parcels was conditioned on BCR I granting the North American Land Trust (NALT) a conservation easement relating to 1,750 acres of BC Ranch.

On December 29, 2005, pursuant to a deed of conservation easement (2005 deed), BCR I granted an easement (2005 easement) to the NALT, a section 501(c)(3) organization. The 2005 deed provided that portions of the area subject to the easement included habitat of the golden-cheeked warbler, an endangered species of bird endemic to, and nesting only in, Texas. Property subject to the

---

[2]BCR I advised purchasers that the partnership planned to contribute approximately 1,866 acres of BC Ranch to BCR II, which would subsequently sell its own LP units to purchasers in substantially similar transactions. BCR I would continue to own approximately 1,877 acres of BC Ranch.

[*5] 2005 easement could not be used for residential, commercial, institutional, industrial, or agricultural purposes. In addition, BCR I retained various rights relating to the property, including rights to raise livestock; hunt; fish; trap; cut down trees; and construct buildings, recreational facilities, skeet shooting stations, deer hunting stands, wildlife viewing towers, fences, ponds, roads, trails, and wells.

The Homesite parcel owners and the NALT could, by mutual agreement, modify the boundaries of the Homesite parcels, provided that any such modification could not "in the Trust's reasonable judgment, directly or indirectly result in any material adverse effect on any of the Conservation Purposes" and "[t]he area of each Homesite parcel * * * [could] not be increased."

At BCR I's direction, the NALT prepared baseline documentation relating to the 2005 easement (2005 baseline documentation). The 2005 baseline documentation, dated December 29, 2005, included: maps, a recorded copy of the 2005 deed, photographs taken in 2004, existing conditions reports (i.e., including a "Site Survey Report" dated March 2007 and prepared by Peter Smith, a conservation biologist), and a signed owner acknowledgement (i.e., pursuant to which Randolph Addison, Jr., certified that BCR I "received and fully reviewed the attached Baseline Documentation in its entirety and that it is an accurate

[*6] representation of the physical condition of the Conservation Area"). The Site Survey Report described BC Ranch and its golden-cheeked warbler habitat. Mr. Smith, in 2007, completed the report using notes Christopher Wilson, NALT's conservation biologist, took during an April 2004 BC Ranch visit. Randolph Addison, Jr., was responsible for reviewing and executing the documentation.

Between October and December 2005 BCR I received signed subscription agreements and payments totaling $8,400,000 from 24 LP unit purchasers. The LP agreement was executed on December 31, 2005. Each limited partner received a Homesite parcel and the rights to build a house on the parcel and use BC Ranch for various activities (e.g., swimming, hiking, biking, horseback riding, and hunting). No partner was required to contribute additional capital to the partnership; any net cashflow would be distributed only to BC Ranch, Inc., BC Ranch I, L.P., and Addison Partners, L.P.; BCR I could not, without the consent of the limited partners, engage in any business unrelated to holding and improving its portion of BC Ranch; and BCR I did not anticipate conducting any for-profit activity, generating any net cashflow, or distributing to the limited partners anything other than Homesite parcels. On an undetermined future date BCR I would convey BC Ranch, subject to the conservation easement, to the Bosque Canyon Ranch Association (BCRA), a not-for-profit homeowners association.

[*7] Each limited partner would receive an interest in the BCRA and pay an annual fee relating to the maintenance of BC Ranch's common areas. The LP units in BC Ranch, prospective membership in the BCRA, and the right to use the common areas, were appurtenant to, and inseparable from, each Homesite parcel.

On April 3, 2006, the Hirsh Valuation Group (Hirsh) provided BCR I an appraisal report, effective November 28, 2005, valuing the 2005 easement at $8,400,000. BCR I in April 2006 executed the declaration of covenants. During that month BCR I executed special warranty deeds transferring Homesite parcels to the 24 limited partners.

II. BCR II

BCR II was formed in December 2005 as a Texas limited partnership. On December 20, 2005, BCR I deeded approximately 1,866 acres of BC Ranch to BCR II.[3] On April 3, 2006, BCR I assigned its interest in BCR II to BC Ranch I, Inc., BC Ranch I, L.P., and Addison Partners, L.P. BC Ranch I, Inc., was BCR II's general and tax matters partner and held a 0.01% interest therein. BC Ranch I, L.P., and Addison Partners, L.P., were BCR II's limited partners, owning 83.33%

---

[3]BCR II's cost basis in its portion of BC Ranch, as of that date, was $2,484,083.

[*8] and 16.66% interests, respectively. During 2006 and 2007 BCR II incurred ranch improvement expenses of $116,562.40 and $816,485.21, respectively.

In 2006 BCR II commenced marketing LP units ranging from $385,000 to $550,000 per unit. The terms of BCR II's offering documents were substantially similar to the terms of BCR I's offering documents. Each purchaser would become a limited partner of BCR II, and the partnership would subsequently distribute to that limited partner a Homesite parcel. The distribution of Homesite parcels was conditioned on BCR II granting the NALT a conservation easement (2007 easement) relating to 1,732 acres of BC Ranch.

On September 14, 2007, pursuant to a deed of conservation easement (2007 deed), BCR II granted the 2007 easement to the NALT. The material terms of the 2007 deed were substantially the same as those of the 2005 deed (i.e., the deed contained nearly identical provisions relating to golden-cheeked warbler habitat, retained rights, and boundary modifications). At BCR II's direction the NALT prepared baseline documentation relating to the 2007 easement (2007 baseline documentation). The 2007 baseline documentation, dated September 24, 2007, included: maps, a recorded copy of the 2007 deed, photographs taken in November 2008, existing conditions reports (e.g., a copy of the 2007 Site Survey Report included in the 2005 baseline documentation), and a partially executed

[*9] owner acknowledgement.[4] Randolph Addison, Jr., was responsible for reviewing and executing the documentation.

Throughout 2007 BCR II received signed subscription agreements and payments totaling $9,957,500 from 23 purchasers. On December 7, 2007, Hirsh provided BCR II an appraisal report, effective September 12, 2007, valuing the 2007 easement at $7,500,000. BCR II's LP agreement, dated December 20, 2005, was executed on December 14, 2007. Between October 2007 and April 2008 BCR II executed special warranty deeds, transferring Homesite parcels to the 23 limited partners. Following these transfers, the 47 limited partners of BCR I and BCR II owned approximately 235 acres, and 3,482 of the remaining 3,509 acres were subject to the 2005 and 2007 easements.

III.  Procedural History

On its 2005 Form 1065, U.S. Return of Partnership Income, prepared by Mr. Mitchell, BCR I claimed an $8,400,000 charitable contribution deduction relating to the donation of the 2005 easement. In addition, BCR I reported capital contributions of $8,400,000. On December 29, 2008, respondent sent BC Ranch, Inc., a notice of final partnership administrative adjustment (2005 FPAA) determining that BCR I was not entitled to a charitable contribution deduction and

---

[4]The document was signed by the NALT but was not signed by BCR II.

[*10] that it was liable for a gross valuation misstatement penalty and/or an accuracy-related penalty pursuant to section 6662(h) and (a), respectively. In an amended answer filed April 26, 2010, respondent contended that the purchasers of BCR I LP units were not bona fide limited partners and, accordingly, did not make bona fide capital contributions to BCR I. Respondent further contended that the transactions at issue were, in substance, sales of real property.

On its 2007 Form 1065, prepared by Mr. Mitchell, BCR II claimed a $7,500,000 charitable contribution deduction relating to the donation of the 2007 easement. In addition, BCR II reported capital contributions of $9,957,500. On August 23, 2011, respondent sent BC Ranch I, Inc., a notice of final partnership administrative adjustment (2007 FPAA) determining that BCR II was not entitled to a charitable contribution deduction; that the purchasers of BCR II LP units were not bona fide limited partners and, accordingly, did not make bona fide capital contributions to BCR II; and that BCR II was liable for a gross valuation misstatement penalty and/or an accuracy-related penalty pursuant to section 6662(h) and (a), respectively. Respondent did not contend that the transactions at issue were sales of real property.

[*11] BCR I and BCR II maintained their principal places of business in Dallas, Texas, at the times their respective tax matters partners filed petitions with the Court. The Court consolidated petitioners' cases.

OPINION

I. BCR I and BCR II Are Not Entitled to Charitable Contribution Deductions

In general, a taxpayer may not claim a deduction relating to a charitable contribution of property consisting of less than the taxpayer's entire interest in the property. See sec. 170(f)(3). A taxpayer may, however, deduct the value of a contribution of a partial interest in property if the contribution constitutes a "qualified conservation contribution." See sec. 170(f)(3)(B)(iii). In general, a "qualified conservation contribution" is a contribution of a "qualified real property interest" to a section 501(c)(3) organization exclusively for conservation purposes. See sec. 170(h)(1), (3)(B). A "qualified real property interest" includes "a restriction (granted in perpetuity) on the use which may be made of the real property." See sec. 170(h)(2)(C). Such a restriction may include an easement relating to real property. See sec. 1.170A-14(b)(2), Income Tax Regs.

The 2005 and 2007 deeds permit modifications to the boundaries between the Homesite parcels and property subject to the easements. Respondent contends that the deeds violate the perpetuity requirement of section 170(h)(2)(C).

[*12] Petitioners contend that the 2005 and 2007 deeds do not violate this requirement because any modifications to the boundaries of the Homesite parcels were subject to the reasonable judgment of the NALT; the exterior boundaries of the property subject to the easements could not be modified; and the overall amount of property subject to the easements could not be decreased. Petitioners' contentions relate to irrelevant facts. As a result of the boundary modifications, property protected by the 2005 and 2007 easements, at the time they were granted, could subsequently lose this protection. Thus, the restrictions on the use of the property were not granted in perpetuity. See sec. 170(h)(2)(C); Belk v. Commissioner, 140 T.C. 1, 10-11 (2013) (holding, pursuant to section 170(h)(2)(C), that an easement is not a qualified real property interest if the boundaries of the property subject to the easement may be modified), supplemented by T.C. Memo. 2013-154, aff'd, 774 F.3d 221 (4th Cir. 2014). Accordingly, the easements do not constitute qualified real property interests and the partnerships are not entitled to deductions relating to qualified conservation contributions. See Belk v. Commissioner, 140 T.C. at 10-11, 15.

Petitioners also failed to make available to the NALT documentation satisfying section 1.170A-14(g)(5)(i), Income Tax Regs. The partnerships reserved rights to conduct various activities (i.e., hunting, trapping, construction,

**[*13]** etc.) having the potential to impair the easements' conservation interests. Prior to December 29, 2005 (i.e., the 2005 easement's grant date), and September 14, 2007 (i.e., the 2007 easement's grant date), petitioners were required to make available to the NALT documentation sufficient to establish the condition of BC Ranch on the date of the transfer. See id. This requirement ensures that the conservation interests are not "adversely affected by the exercise of the reserved rights" and that "the donor will be able to deduct only what the donee organization actually receives." See Graev v. Commissioner, 140 T.C. 377, 388 (2013); sec. 1.170A-14(g)(5)(i), Income Tax Regs.

The 2005 and 2007 baseline documentation was unreliable, incomplete, and insufficient to establish the condition of the relevant property on the date the respective easements were granted. The Site Survey Report included in the December 2005 baseline documentation was completed in March 2007, 15 months after the date of the transfer. The report described BC Ranch as of April 2004, whereas the 2005 deed was executed on December 29, 2005. Construction on, and development of, the property occurred during the intervening 20-month period, rendering the description untimely and unreliable. In addition, the March 2007 report was inexplicably included in documentation that purported to be a "fully reviewed * * * accurate representation" of the property, as of December 2005.

[*14] The reference to the Site Survey Report in the 2005 baseline documentation's table of contents indicates that the table of contents was not prepared until March 2007, at the earliest. In addition, the Site Survey Report included in the 2007 baseline documentation was based on a 2004 BC Ranch visit. Thus, it failed to provide a timely and accurate description of the property subject to the 2007 easement. Petitioners also could not explain why the 2007 baseline documentation included photographs taken in November 2008. In rambling, incoherent testimony, Andrew Johnson, president of the NALT, failed to clarify these glaring inconsistencies. He appeared to be unfamiliar with the baseline documentation; did not know when it had been prepared or who had prepared various portions; and admitted he "never felt that we had to stop preparing a baseline at some artificial date" and that portions of the documentation (e.g., a map purporting to reflect the habitat of the golden-cheeked warbler) were "fairly imprecise".

The owner acknowledgment (i.e., providing that the documentation was fully reviewed and accurately described the condition of the property) in the 2007 baseline documentation was not executed prior to the September 24, 2007, recording of the 2007 easement. In addition, when asked whether he had signed the owner acknowledgement in the 2005 baseline documentation prior to

[*15] December 29, 2005 (i.e., the 2005 easement's grant date), Randolph Addison, Jr., stated: "I don't know what day I signed the document".

In sum, the 2005 baseline documentation and 2007 baseline documentation were insufficient to establish the condition of the property prior to the dates of the transfers. We find meritless, and reject, petitioners' substantial compliance contention.

## II. The Property Transfers Were Disguised Sales

Respondent established that the partnerships, in effect, sold Homesite parcels and appurtenant rights thereto to their limited partners for $350,000 to $550,000.[5] The partnerships deeded the Homesite parcels to their limited partners within five months of the partnerships' acceptance of the limited partners' payments. See sec. 707(a)(2)(B); sec. 1.707-3(b)(1), (c)(1), Income Tax Regs. (providing that a disguised sale occurs if a "transfer of money or other consideration" by one party would not be made but for an initial transfer of property by the other party and that transfers between a partnership and a partner

---

[5]The disguised sale issue was not asserted in the FPAAs and is thus a new matter. See Rule 142(a). Respondent, however, has met his burden. We need not determine whether the LP unit purchasers were bona fide limited partners in the partnerships. See sec. 1.707-3(a)(3), Income Tax Regs. ("If a person purports to transfer property to a partnership in a capacity as a partner, the rules of this section apply * * * even if it is * * * [subsequently] determined * * * that such person is not a partner.").

[*16] within a two-year period are "presumed to be a sale * * * unless the facts and circumstances clearly establish that the transfers do not constitute a sale").[6] The following facts and circumstances establish that the property transfers at issue were disguised sales:  the timing and amount of the distributions to the limited partners were determinable with reasonable certainty at the time the partnerships accepted the limited partners' payments; the limited partners had legally enforceable rights, pursuant to the LP agreements, to receive their Homesite parcels and the appurtenant rights; the transactions effectuated exchanges of the benefits and burdens of ownership relating to the Homesite parcels; the distributions to the partners were disproportionately large in relation to the limited partners' interests in partnership profits; and the limited partners received their Homesite parcels in fee simple without an obligation to return them to the partnerships.  See sec. 1.707-3(b)(2), Income Tax Regs.

When transfers are not made simultaneously, a disguised sale occurs only if "the subsequent transfer is not dependent on the entrepreneurial risks of partnership operations."  See id. subpara. (1)(ii).  We reject petitioners' contention

_____

[6]Sec. 1.707-3, Income Tax Regs., applies to disguised sales of property by a partner to a partnership.  Sec. 1.707-6(a), Income Tax Regs., provides that similar rules apply to disguised sales of property by a partnership to a partner. Accordingly, we apply such similar rules in this case.

[*17] that the limited partners' payments would be at risk, pursuant to the terms of the LP agreements, if the easements were not granted. The provisions in the agreements, purporting to condition the distributions of Homesite parcels on the donations of the easements to the NALT, were inconsequential. The 2005 easement was granted on December 29, 2005, two days prior to the date on which the BCR I LP agreement was executed, and the 2007 easement was granted in September 2007, three months prior to the date the BCR II LP agreement was executed. In addition, Mr. Friedman and Randolph Addison, Jr., both testified that the partnerships would have refunded the amounts paid by the limited partners if the easements were not granted. In sum, the distributions to the limited partners were made in exchange for the limited partners' payments and were not subject to the entrepreneurial risks of the partnerships' operations. Accordingly, each exchange constituted a disguised sale of partnership property by BCR I or BCR II in exchange for each limited partner's payments. See sec. 707(a)(2)(B); sec. 1.707-3(b)(1), Income Tax Regs. The property sold to each limited partner consisted of a Homesite parcel and an appurtenant right to use BC Ranch's common areas (i.e., a one-forty-seventh interest therein). The 24 disguised sales

**[*18]** effectuated by BCR I and the 23 disguised sales effectuated by BCR II constituted sales by the partnerships of all of their interests in BC Ranch.[7]

BCR I and BCR II were required to recognize, and include in their gross income relating to 2005 and 2007, respectively, any gains relating to the disguised sales (i.e., taking into account adjusted basis in the property sold). See secs. 61(a)(3), 707(a)(2)(B), 1001; sec. 1.707-3(a)(2), Income Tax Regs. BCR I's adjusted basis in the property sold in each disguised sale (i.e., a Homesite parcel and the appurtenant rights thereto) included one twenty-fourth of BCR I's cost basis in BC Ranch and one twenty-fourth of the ranch improvement expenses the partnership incurred as of the date of the sale. See sec. 1016(a); sec. 1.1016-2(a), Income Tax Regs. Similarly, BCR II's adjusted basis in the property sold in each disguised sale included one twenty-third of its cost basis in BC Ranch and one twenty-third of the ranch improvement expenses the partnership incurred as of the date of the sale. See sec. 1016(a); sec. 1.1016-2(a), Income Tax Regs.

---

[7]The partnerships did not transfer title in the common areas of BC Ranch to the limited partners. The LP agreements and the declaration of covenants, however, provided that the partnerships would eventually contribute BC Ranch to the BCRA, and that the limited partners would receive membership interests in the BCRA. Accordingly, following the disguised sales, the partnerships held title to BC Ranch for the benefit of the limited partners.

[*19] The BCR I and BCR II sales occurred on December 31, 2005, and December 14, 2007, respectively.[8] On those dates, the purchasers of the LP units were admitted as limited partners, the partnerships incurred contractual obligations to transfer the Homesite parcels, and the partnerships had the unrestricted right to accept and use the limited partners' payments as consideration for the Homesite parcels and appurtenant rights. See Calloway v. Commissioner, 135 T.C. 26, 33-34 (2010) (holding that factors for determining when a sale occurs include "how the parties treat the transaction" and "whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments"), aff'd, 691 F.3d 1315 (11th Cir. 2012); sec. 1.707-3(a)(2), Income Tax Regs. (providing that a disguised sale takes place "on the date that * * * the partnership is considered the owner of the property").

III. BCR I and BCR II Are Liable for Gross Valuation Misstatement Penalties

Pursuant to section 6662(h) a taxpayer may be liable for a 40% penalty on the portion of an underpayment of tax (i.e., required to be shown on a return) that

---

[8]Certain Homesite parcels were deeded to limited partners of BCR II before December 14, 2007. On the dates those deeds were executed, BCR II obtained the unrestricted right to the relevant payments and, accordingly, the sales of those Homesite parcels occurred on those dates. See Calloway v. Commissioner, 135 T.C. 26, 33-34 (2010), aff'd, 691 F.3d 1315 (11th Cir. 2012); sec. 1.707-3(a)(2), Income Tax Regs.

**[\*20]** is attributable to a gross valuation misstatement. For returns filed on or before August 17, 2006, a gross valuation misstatement is a misstatement of the value of property by 400% or more of the property's value. See sec. 6662(h). For returns filed after August 17, 2006, the penalty applies to misstatements of the value of property by 200%. See Pension Protection Act of 2006, Pub. L. No. 109-280, sec. 1219(a)(2)(B), 120 Stat. at 1083. When the actual value of the property is zero and the value claimed is greater than zero, the gross valuation misstatement penalty applies. See sec. 1.6662-5(g), Income Tax Regs.

BCR I, on its 2005 Form 1065, claimed a charitable contribution deduction valuing the 2005 easement at $8,400,000. Zero was the correct value relating to the 2005 easement because BCR I was not entitled to a deduction. See Woods v. United States, 571 U.S. ___, ___, 134 S. Ct. 557, 566 (2013) (holding that the gross valuation misstatement penalty applies to misstatements relating to legal, as well as factual, errors).[9] Accordingly, BCR I is liable for a gross valuation

---

[9]The Court of Appeals for the Fifth Circuit, to which an appeal of this case would lie, has held that a valuation misstatement penalty does not apply when a deduction is disallowed for a reason unrelated to valuation (i.e., it is disallowed because it is not legally permitted). See Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), rev'g T.C. Memo. 1988-408; Todd v. Commissioner, 862 F.2d 540 (5th Cir. 1988), aff'g 89 T.C. 912 (1987). Woods rejects the distinction between legal and factual valuation misstatements. See Woods v. United States, 571 U.S. ___, ___, 134 S. Ct. 557, 566-567 (2013).

[*21] misstatement penalty unless it demonstrates that it acted reasonably and in good faith. See sec. 6664(c); sec. 1.6662-5(g), Income Tax Regs. BCR I is entitled to raise a reasonable cause defense, relating to the 2005 gross valuation misstatement penalty, because the Hirsh report was a qualified appraisal by a qualified appraiser and BCR I's reliance on Hirsh and Mr. Mitchell constituted a good-faith investigation of the 2005 easement's value. See sec. 6664(c)(3); Chandler v. Commissioner, 142 T.C. 279, 296 (2014). Notwithstanding its actions relating to the qualified appraisal of the 2005 easement, BCR I did not act reasonably or in good faith with respect to the documentation requirements of section 1.170A-14(g)(5)(i), Income Tax Regs. The 2005 baseline documentation was insufficient, unreliable, and incomplete, and BCR I's submission of this documentation to the NALT did not constitute a reasonable attempt to comply with section 170 and the related regulations. Randolph Addison, Jr., failed to effectively supervise or review the NALT's slipshod preparation of the baseline documentation and BCR I thereby failed to satisfy its responsibility relating to the preparation of the documentation. Any reliance on the NALT by BCR I was accordingly unreasonable. Moreover, BCR I failed to make any plausible contentions sufficient to establish reasonable cause. Accordingly, BCR I is liable for a section 6662(h) gross valuation misstatement penalty relating to the 2005

[*22] underpayment of tax attributable to claiming a charitable contribution deduction.

BCR II, on its 2007 Form 1065, claimed a charitable contribution deduction valuing the 2007 easement at $7,500,000.  Zero was the correct value relating to the 2007 easement because BCR II was not entitled to a deduction.  See Woods, 571 U.S. at ___, 134 S. Ct. at 566.  Effective for returns filed after August 17, 2006, taxpayers may not claim a reasonable cause defense for gross valuation misstatements relating to charitable contribution deductions.  See sec. 6664(c)(3).  Accordingly, BCR II is liable for a section 6662(h) gross valuation misstatement penalty relating to the 2007 underpayment of tax attributable to claiming a charitable contribution deduction.

Contentions we have not addressed are irrelevant, moot, or meritless.

To reflect the foregoing,

Decisions will be entered

under Rule 155.